Florence Wattles HARTZ, Margaret Elwyn Roth and Globe Indemnity Company, Appellants,

v.

UNITED STATES of America, Appellee.

No. 23647.

United States Court of Appeals Fifth Circuit.

Jan. 11, 1968.

John W. Prewitt, Vicksburg, Miss., George E. Morrow, Memphis, Tenn., Glover McGhee, Albert E. Phillips, Atlanta, Ga., Swift, Currie, McGhee & Hiers, Atlanta, Ga., Martin, Tate & Morrow, Memphis, Tenn., Prewitt & Bullard, Vicksburg, Miss., for appellants.

Morton Hollander, Lawrence R. Schneider, Howard J. Kashner, David L. Rose, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before TUTTLE and AINSWORTH, Circuit Judges, and FULTON, District Judge.

FULTON, District Judge:

These are consolidated actions which were brought under the Federal Tort Claims Act (28 U.S.C. §§ 1346(b), 2671 et seq.) to recover for the deaths of William B. Hartz and Harold S. Roth and for property damage to a Beechcraft Bonanza airplane. The deaths and damage occurred when the Bonanza crashed on a take-off from the Atlanta Municipal Airport. Hartz was the pilot of the Bonanza. He was certified as a pilot by the Federal Aviation Agency. Roth was his passenger.

After dark, about seven o'clock on the evening of November 10, 1961, an Eastern Air Lines DC–7, Flight No. 131, was awaiting clearance to take off from Runway 27 at said airport. The DC–7 was positioned upon the east end of said runway which is 7,860 feet long and runs in an east-west direction. While the DC–7 was there awaiting clearance for take-off, Hartz radioed the airport control tower seeking permission for the Bonanza to take off upon Runway 27 from an intersecting approach approximately 2,160 feet west of the east end of said runway. Acting upon instructions from the tower, the Bonanza taxied to a point where said approach intersects Runway 27 and then stopped at the entrance to Runway 27 for further instructions for take-off.

John H. Dillworth, who was then the Local Control Operator for the airport, cleared the DC–7 for take-off. Dillworth will hereinafter be referred to as the "controller." The DC–7 began its run down on Runway 27 and passed directly in front of the Bonanza, which was parked upon said approach to Runway 27 awaiting further instructions from the tower. The DC–7 became airborne 25 to 30 seconds after it started down said runway, at a point some 2,500 to 3,000 feet west of the east end thereof. The speed of the DC–7 over the ground at the point where it became airborne was approximately 115 knots per hour. Within five seconds thereafter its air speed was between 130 and 140 knots per hour. This air speed was maintained until it passed over the west end of Runway 27, at which time the DC–7 was at an altitude of between 100 and 300 feet.

About 30 seconds after the DC–7 acknowledged by radio its clearance for take-off, the controller instructed the Bonanza to move into a take-off position upon Runway 27 and then hold.

Immediately after the Bonanza was positioned on Runway 27 the controller cleared it for take-off, at which time the controller gave Hartz the following warning:

"November 96 Delta cleared for take-off, watch the prop wash."

The Bonanza then began to move down the runway and became airborne. Moments later, while the Bonanza was still airborne over Runway 27, it encountered violent turbulence and was thereby thrown into an inverted attitude, whereupon it crashed killing the pilot and his passenger. The turbulence which the Bonanza encountered was a trailing vortex which was shed by the right wing of the departing DC–7. This phenomenon, which was the proximate cause of the crash, is known as wing tip vortex.

In the Federal Tort Claims actions which followed, appellants alleged that the proximate cause of the crash was the negligence of the controller, an employee of the Federal Aviation Agency. The United States contended, and the District Judge found, that the controller had no legal duty, statutory or otherwise, to do anything more than maintain separation between the aircraft sufficient to avoid a collision. The United States further specifically and successfully argued that although the controller had no duty to warn Hartz of turbulence, the warning which the controller gave to Hartz was adequate to apprise Hartz of possible danger from the turbulence created by the departing DC–7. The District Judge concluded and ruled that the controller breached no duty that was owed to plaintiffs' decedents and that the sole proximate cause of the crash was the negligence of Hartz.

Appellants assigned 22 points of error but the controlling issues upon this appeal are the following:

1. Did the controller have a duty to give Hartz a warning which would include possible danger from wing tip vortex?

2. If the controller did owe Hartz such duty, was the warning which he gave Hartz sufficient to discharge that duty?

We hold that there was a duty to so warn and that the warning which the controller gave was insufficient.

The procedures to be followed by an airport controller are set forth in an operations manual which is provided by the Federal Aviation Agency. This manual is designated The Air Traffic Control Procedures Manual (ATM–2–A). A copy thereof was received in evidence and was relied upon by the trial court in resolving liability. At this juncture it is necessary to refer to this manual to ascertain to what extent it bears upon the duty, if any, of the controller to warn Hartz of wing tip vortex from the DC–7. Among other things the manual provides:

1. The authority and responsibility of a pilot in command of aircraft.[1]

2. For clearances, instructions and information from the controller to aircraft as to observed or known traffic conditions at or near the airport.[2]

3. The minimal separation requirements for aircraft departing the airport from the same runway.[3]

---

1. 60.2—AUTHORITY OF THE PILOT
   The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to operation of the aircraft.

2. 411—CLEARANCE, INSTRUCTIONS AND INFORMATION
   411.1—
   Clearances, instructions and information issued by airport traffic controllers shall be predicated solely upon observed or known traffic or airport conditions which,

in their judgment, may constitute collision hazards to aircraft. This may include the positions of aircraft in flights within the control zone or operating on the movement area, and observed or known vehicular traffic and temporary obstructions on or immediately adjacent to said area.

3. 422—MINIMA
   Except as provided in 423 or 424, separation between aircraft using the same

4. The precise phraseology to be employed in warning a departing pilot of possible danger from wing tip vortex.[4]

## WAS THERE A DUTY TO WARN OF WING TIP VORTEX?

We recognize that government regulations having the force and effect of law have established that a pilot retains primary responsibility for the movement of his aircraft.[5] Tilley v. United States, 375 F.2d 678 (4th Cir. 1967); United States v. Schultetus, 277 F.2d 322, 86 A.L.R.2d 375 (5th Cir. 1960), cert. denied 364 U.S. 828, 81 S. Ct. 67, 5 L.Ed.2d 56. See also De Vere v. True-Flite, Inc., 268 F.Supp. 226 (E.D.N.C.1967). This concept is clearly defined in United States v. Miller, 303 F.2d 703 (9th Cir. 1962) cert. denied 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502. Nonetheless, before a pilot can be held legally responsible for the movement of his aircraft he must know, or be held to have known, those facts which were then material to the safe operation of his aircraft.

In connection with the responsibility of the pilot, the following facts are pertinent. The controller was stationed high above the lighted airfield where he had a commanding view of the DC–7 and the Bonanza and all other aircraft upon and in the vicinity of the airport; he was an experienced controller who knew, or by the exercise of reasonable care should have known, that it was hazardous for a small airplane to immediately follow the take-off of a DC–7. In contrast, Hartz was down below on an approach to Runway 27 studying his cockpit instrument panel and awaiting take-off directions. His ability to judge movement on the field was limited both by his position and his involvement with the operation of his aircraft. Clearly, the controller was the one better qualified by training, experience and vantage position to estimate time and distance and it was his duty to direct and guide the Bonanza in a manner consistent with its safety and the safety of all who might be affected by its operation. It was the controller's responsibility to appropriately warn Hartz of the possible danger of wing tip vortices from the large commercial airliner which was departing immediately ahead of him.

The trial court concluded that no duty existed "independent of the duty created by the procedures manual." We disapprove the view that the duty of an FAA controller is circumscribed within the narrow limits of an operations manual and nothing more. We approve the view expressed by the Court of Appeals for the Second Circuit in Ingham v. Eastern Air Lines, Inc., 373 F.2d 227 (2nd Cir. 1967), as follows:

"While air travel in this jet age has become commonplace, we know too well that there is always lurking the possibility of tragic accidents capable of snuffing out the lives of hundreds in a mere matter of seconds. Much of the success in preventing such disasters can be attributed to the federal government's assumption of the supervision of commercial flying; and public confidence in air travel has been fostered in large measure by

---

runway shall be effected in accordance with the minima set forth below.

   \*     \*     \*     \*     \*

422.2—

Between departing aircraft, sufficient separation so that: *The preceding aircraft has either crossed the opposite end of the runway or turned away from the projected path of the succeeding aircraft before the latter begins takeoff run.*

4. 437—PHRASEOLOGY

Phraseology shall be employed as set forth below.

   \*     \*     \*     \*     \*

439.12—To issue take-off clearance: CLEARED FOR TAKEOFF.

   \*     \*     \*     \*     \*

439.18—To issue cautionary information regarding possible rotorcraft downwash, thrust stream turbulence, and/or wing tip vortices: CAUTION, TURBULENCE (Traffic information).

EXAMPLE: CAUTION, TURBULENCE, DEPARTING AMERICAN ELECTRA.

5. See Footnote No. 1.

knowledge that our government, recognizing the high stakes involved, is constantly overseeing the carrier's operations in order to promote safety.

\* \* \* \* \* \*

"It is now well established that when the government undertakes to perform services, which in the absence of specific legislation would not be required, it will, nevertheless, be liable if these activities are performed negligently."

A further discussion of this issue which we endorse is found in Johnson v. United States, 183 F.Supp. 489 (E.D.Mich. 1960).

## WAS THE WARNING SUFFICIENT?

Two facts are well established. One, the controller cleared the Bonanza for take-off with the following warning:

"November 96 Delta cleared for take-off, watch the prop-wash."

Two, the Bonanza crashed on take-off after it came into contact with the trailing vortex which was shed by the right wing of the DC–7. ,

Obviously, the controller knew that he was clearing the Bonanza for a take-off into possible danger from turbulence created by the DC–7, a turbulence which may have included wing tip vortex. A warning was required, one that would meet the requirements of the manual. The manual, which was cited by the government to show the pilot's responsibility, provides the precise phraseology which shall be employed by the controller when communicating with a pilot who is about to take off.[6] If the controller in the instant case had followed his manual, he would have warned the pilot of the Bonanza as follows:

"CAUTION, TURBULENCE, DEPARTING EASTERN DC–7."

Instead, the caution which the controller gave to Hartz was "watch the prop-wash." Testimony at the trial revealed that prop-wash and wing tip vortex are not one and the same. Prop-wash is less severe; it takes less time to dissipate. Stated differently, vortex is a more hazardous form of turbulence. The controller's use of the term "prop-wash" may have misled Hartz to believe that he would encounter a minimal wind force which would not endanger his aircraft.

■ We hold that the controller gave Hartz a warning which was neither sufficient under the manual nor adequate to caution Hartz of a possible danger which was then known to the controller. The failure of the controller to properly caution Hartz of the possible danger of wing tip vortex imposed upon the controller an additional duty to delay take-off clearance for the Bonanza for such period as was reasonably necessary to permit such turbulence from the DC–7 to dissipate. The controller's breach of duty clearly was a proximate cause of the crash of the Bonanza. Furumizo v. United States, 245 F.Supp. 981 (D.Hawaii, 1965), aff'd 381 F.2d 965 (9th Cir., 1967).

## OTHER POINTS OF ERROR

Our disposition of the foregoing issues makes it unnecessary to consider appellants' other contentions upon this appeal.

Reversed and remanded for further proceedings not inconsistent with this Opinion.

6. See Footnote No. 4.