Dawn Covington **CARNEY, As administratrix of the Estate of John Lack Carney, Plaintiff,**

v.

**UNITED STATES of America; Department of Transportation; Federal Aviation Administration, Defendants.**

**Civ. A. No. E83–0084(L).**

United States District Court,
S.D. Mississippi, E.D.

March 28, 1986.

John W. Boling, Meridian, Miss., for plaintiff.

Richard K. Willard, Asst. Atty. Gen., George L. Phillips, U.S. Atty., L.A. Smith, III, Asst. U.S. Atty., Kathlynn G. Fadley, Trial Atty., Washington, D.C., for defendants.

## MEMORANDUM OPINION

TOM S. LEE, District Judge.

This cause came before the court for trial on the complaint of the plaintiff,

Dawn Covington Carney, as administratrix of the estate of John Lack Carney. At trial, the court received exhibits introduced into evidence, heard testimony from witnesses and received briefs from counsel.

Plaintiff is the widow of John Lack Carney (Carney) who died as a result of an airplane crash on March 19, 1980. Plaintiff contends that the negligence of the air traffic controller at Meridian Radar Approach Control (Meridian) was the proximate cause of the crash[1] and brought this action against the United States[2] pursuant to the Federal Torts Claim Act (FTCA), 28 U.S.C. §§ 1346, *et seq.*

Carney received his pilot license on September 5, 1979 and, according to the National Transportation Safety Board (NTSB) accident report, had accumulated 105 hours of pilot time, nine of which were at night and 1.5 of which were actual instrument time.

At 2256 GMT[3] on March 19, 1980, Carney contacted the Albany, Georgia Flight Service Station (Albany FSS) for current weather conditions and was advised of VFR conditions[4] along his proposed route of flight to Meridian, Mississippi. En route, Carney contacted a Columbus, Georgia Air Traffic Controller regarding weather and was told of widely scattered percipitation that could be avoided. He later made contact with a Montgomery, Alabama Air Traffic Controller who told him of "weather just west of Montgomery that appears to be moderate" and gave Carney vectors to avoid the weather. In response to Carney's question, "this weather's not suppose to deteriorate ah great deal until about 10:00 o'clock is it?," the air traffic controller stated, "I don't know, I haven't heard a forecast yet." Carney did not wait for the forecast, responding, ". . . we thank you sir, we may have to turn around and come back to you but we are going to amble on, thank you sir."[5]

Carney's next communication with an air traffic controller occurred when he was "twenty seven DME miles uhh east of the Kewanee VOR." In response, Marian A. Jennings, an air traffic controller on duty at Meridian, gave him current weather conditions and asked if Carney were requesting IFR[6] handling into Key Field. The conversation continued:[7]

| 0044:06 | Carney | It is uh its still marginal VFR idn't it |
| 0044:12 (0045) | Meridian | No sir its IFR at this time standby |
| 0045:07 | Meridian | November seven five six sierra mike squawk zero two zero zero and ident and uh—what would you like to do you wanna go into the airport on IFR or are you IFR qualified |
| 0045:18 | Carney | Uh I'm not iFR qualified I would like to try and land there if uh if its at all possible |
| 0045:23 | Meridian | Roger sir I'll try to get you a special VFR into the airport possibly you can get in uh to the airport we can make a try anyway |

rules governing the procedures for conducting instrument flight.

---

1. Prior to trial, plaintiff also raised claims regarding the alleged negligence of other Federal Aviation Administration employees, but those claims have apparently been abandoned as no evidence relating thereto was offered at trial.

2. The Department of Transportation and the Federal Aviation Administration were also named as defendants but, according to the pretrial order, the parties agree that these defendants should be dismissed.

3. All times quoted are Greenwich Mean Time.

4. Visual flight rules (VFR) are the rules that govern the procedures for conducting flight under visual conditions. The term "VFR" is also used to indicate weather conditions that are equal to or greater than minimum VFR requirements. Instrument flight rules (IFR) are the

5. Based on this statement, the court must conclude that Carney knew he was flying at night into weather conditions that might not allow VFR flight. Additionally, Carney was certainly aware of his experience with such conditions. H. William Barnhouse, expert witness for defendant, testified that Carney exercised poor judgment in deciding to make the flight under these conditions.

6. *See supra* note 3.

7. The transcription included in this opinion is taken from the NTSB accident package.

| Time | Station | Message |
|---|---|---|
| 0045:33 | Carney | Okie doke I'd like for you to try uh I'm I don't know I'm twenty three DME miles uh from Kewanee and my visibility is still good I'm in a little light rain but uh having no problem with visibility |
| 0045:44 | Meridian | Roger you're still a long ways from the airport you're radar contact position is two three miles east of Kewanee VORTAC—squawk zero two zero |
| 0045:52 | Carney | Zero two zero zero is that what you said |
| 0045:55 (0046) | Meridian | Zero two one zero |
| 0046:02 | Carney | Zero two one zero roger |
| 0046:03 (0047) (0048) (0049) | Meridian | That's affirmative |
| 0049:47 | Meridian | Seven five six sierra mike this is Meridian uh unless you got an—IFR—uh qualification you're not goint to be able to get into the Meridian airport |
| 0049:57 (0050) | Carney | Six sierra mike roger where's the closest place |
| 0050:02 | Meridian | I really uh—York airport's off to your right there ten miles can you how's your visibility up to the northwest uv you |
| 0050:12 | Carney | Uh—fair pretty fair |
| 0050:14 | Meridian | Well you might wanna drive up to the northwest and see if you can get York in sight its uh ten miles due northwest of you |
| 0050:20 | Carney | Okay can you vector me up that way |
| 0050:23 | Meridian | Sure can turn right heading three four zero vector to York airport—and uh maintain VFR conditions if you encounter any conditions that you do not wish to fly through avoid them and advise me |
| 0050:34 | Carney | Six sierra mike roger heading three four zero |
| 0050:43 | Meridian | Six sierra mike say again |
| 0050:46 (0051) | Carney | Six sierra mike roger |
| 0051:36 | Carney | Meridian Approach where do you have me and uh in reference to uh York the York airport |
| 0051:42 | Meridian | You're seven miles south of York at this time turn right heading three five zero |
| 0051:44 | Carney | Three five zero roger |
| 0051:52 | Carney | We have uh dropped down to about sixteen hundred feet uh tuh be able to maintain visibility |
| 0051:54 (0052) | Meridian | Roger |
| 0052:53 (0053) | Meridian | November six sierra mike the field lighting is uh the beacon is on from dusk to dawn and they have medium intensity runway lights runway is seven and two five—and the uh—length of the runway is three thousand two hundred feet hard surface |
| 0053:08 | Carney | Six sierra mike roger where do you have me now in reference to York and the airport |
| 0053:13 | Meridian | Okay York airports twelve o'clock three miles from your position turn left heading three four five |
| 0053:22 | Carney | Three four five roger |
| 0053:23 | Meridian | And York airport is not attended uh during uh—hours of darkness |
| 0053:28 | Carney | Six sierra mike roger |
| 0053:56 | Meridian | Six sierra mike you're right over the York airport at this time |
| 0053:58 (0054) | Carney | I doggone sure don't see it yet I see the lights of York but I sure don't see the airport hold on a minute let me look again |
| 0054:06 | Meridian | All right it's right underneath you |
| 0054:13 | Meridian | Look straight down |
| 0054:21 | Carney | Six sierra mike roger have it in sight |
| 0054:23 | Meridian | Six sierra mike roger what are your intentions |
| 0054:26 | Carney | I'm uh goah head and try to land |
| 0054:28 | Meridian | All right sir squawk VFR and uh frequency change approved good day |

| Time | Station | Communication |
|---|---|---|
| 0054:32 | Carney | Six sierra mike roger is there any high towers over heah |
| 0054:35 | Meridian | No sir not to my knowledge |
| 0054:37 | Carney | Six sierra mike roger |
| 0054:38 | Meridian | And I'd suggest a right turn back let me give you the winds again at Meridian—uh we're carrying at the Naval Air Station—zero eight zero at four zero eight zero at four |
| 0054:56 | Carney | Sierra mike roger we are now at a thousand feet |
| 0054:58 (0055) | Meridian | Roger |
| 0055:02 | Carney | And we're making a right turn to uh to try to land |
| 0055:04 | Meridian | All right sir are you gonna go ahead and terminate your flight plan I'll call Flight Service for you if you are |
| 0055:08 | Carney | Uh yes sir wait and let me get on the ground |
| 0055:12 | Meridian | Okay well give me a call once you get on the ground and if you can't reach me then call Flight Service yourself by telephone |
| 0055:17 | Carney | Six sierra mike roger we thank you sir |
| 0055:19 | Meridian | Roger give me a call if you can |
| 0055:22 (0056) (0057) (0058) (0059) | Carney | Okie doke |
| 0059:27 | Meridian | Six sierra mike approach |
| 0059:33 | Meridian | November seven five six sierra mike Meridian approach |

■ Under the FTCA, the law to be applied, including choice of law principles, is that "of the place where the act or omission occurred." 28 U.S.C. § 1346(b). *See Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Plaintiff presented evidence at trial regarding allegations of negligence by a Meridian, Mississippi air traffic controller. The United States argues that the "act or omission" was the negligence of the pilot which occurred in Alabama. This court is of the

opinion, however, that the alleged negligence of the air traffic controller is the primary issue before the court and forms the basis of this court's jurisdiction and, accordingly, Mississippi conflict of laws principles must be applied.

In *Mitchell v. Craft,* 211 So.2d 509 (Miss. 1968), the Mississippi Supreme Court adopted the center of gravity test as set out in § 145 of the Restatement (Second) of conflict of laws. Under that analysis, the court is to consider:

(1) the place where the injury occurred;

(2) the place where the conduct causing the injury occurred;

(3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

(4) the place where the relationship, if any, between the parties is centered. *Mitchell,* 211 So.2d at 515. Applying this analysis, the court is of the opinion that Mississippi law is applicable. Although the injury occurred in Alabama, the parties resided in Mississippi and the relationship between the air traffic controller and pilot was centered in Mississippi, that being the location of the controller and place to which the pilot originally intended to go. Additionally, the alleged negligence charged in plaintiff's complaint occurred in Mississippi.[8]

■ Under Mississippi law, a claim of negligence includes four elements: (1) duty, (2) breach of duty, (3) causal relationship and (4) damages. *See Ward v. Hobart Manufacturing Co.,* 450 F.2d 1176 (5th Cir.1971) (applying Mississippi law). The duty of the air traffic controller is established by relevant federal regulations and the Air Traffic Control Manual (ATCM) and supplemented by the general duty of due care under the circumstances. *See Ross v. United States,* 640 F.2d 511, 519 (5th Cir. 1981). Accordingly, strict compliance with the federal regulations and the ATCM may

---

**8.** Plaintiff also originally alleged negligent weather briefings given in Alabama and Geor-

gia. Those allegations were not pursued at trial.

not always absolve the United States of liability. It should also be noted that the "[s]tandards of due care in aviation cases are concurrent, resting upon both the airplane pilot and ground personnel; both are responsible for the safe conduct of the aircraft." *Dyer v. United States*, 551 F.Supp. 1266, 1275–76 (W.D.Mich.1982). *See also Spaulding v. United States*, 455 F.2d 222 (9th Cir.1972). Primary responsibility, however, rests with the pilot. "The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft." 91.-3(a) FAR. The air traffic controller "cannot assume that responsibility and is not to interfere except as specifically required by FAA procedures." *American Airlines v. United States*, 418 F.2d 180 (5th Cir.1969).

Chapter 8 of the ATCM in effect at the time of the accident addresses procedures to be followed by air traffic controllers in the event of an emergency and the relevant portions provide:

1550. EMERGENCY DETERMINATIONS

When you believe an emergency exists or is imminent, select and pursue a course of action which appears to be most appropriate under the circumstances and which most nearly conforms to the instructions in this manual. If you are in doubt that a given situation constitutes a potential emergency, handle it as though it were an emergency.

Note.—Because of the infinite variety of possible situations, specific procedures cannot always be prescribed for every situation which might be considered an emergency. As a rule of thumb, an emergency includes any situation which places an aircraft in danger, i.e., uncertainty, alert, being lost, or in distress.

1551. OBTAINING INFORMATION

Obtain enough information to handle the emergency intelligently. Base your decision as to what type of assistance is needed on information and requests received from the pilot because he is authorized by FAR 91 to determine a course of action.

1591. RADAR ASSISTANCE TO VFR AIRCRAFT IN WEATHER DIFFICULTY

a. If a VFR aircraft requests radar assistance when it encounters or is about to encounter IFR weather conditions, ask the pilot if he is qualified for and capable of conducting IFR flight.

b. If the pilot states he is qualified for and capable of IFR flight, request him to file an IFR flight plan and then issue clearance to destination airport, as appropriate.

c. If the pilot states he is not qualified for or not capable of conducting IFR flight, or if he refuses to file an IFR flight plan, take whichever of the following actions is appropriate:

(1) Inform the pilot of airports where VFR conditions are reported, provide other available pertinent weather information, and ask if he will elect to conduct VFR flight to such an airport.

(2) If the action in (1) is not feasible or the pilot declines to conduct VFR flight to another airport, provide radar assistance if the pilot:

(a) Declares an emergency.

(b) Refuses to declare an emergency and you have determined the exact nature of the radar services the pilot desires.

(3) If the aircraft has already encountered IFR conditions, inform the pilot of the minimum safe altitude. If the aircraft is below the minimum safe altitude and sufficiently accurate position information has been received or radar identification is established, furnish a heading or radial on which to climb to reach the minimum safe altitude.

According to plaintiff's interpretation of the events leading to the crash, air traffic controller Jennings, without obtaining sufficient information to make a responsible decision and without sensitivity to the allegedly obvious emotional condition and inexperience of the pilot, ordered Carney to head toward York airport and then make a difficult right turn and land there, the physical and weather conditions of which

he was ignorant, and then proceeded with a flood of unnecessary chatter, further disorienting and confusing the pilot. Plaintiff's analysis is simply not supported by the facts, which indicate no breach of duty by the air traffic controller.

Plaintiff contends that Jennings failed to obtain necessary information such as the type of plane Carney was flying, the amount of fuel, instrument capability of the aircraft, instrument experience of Carney, and his number of pilot hours, in alleged violation of paragraph 1551 of the ATCM. Paragraph 1551, being included in the chapter of the ATCM entitled "Emergencies," is therefore limited in applicability to an emergency situation, which has not been shown to have existed in this case. In consideration of this contention, it must be noted that Carney never volunteered any of this information although he was certainly under a duty to inform the air traffic controller of any pertinent facts.

The court cannot agree with plaintiff's contention that Carney's voice and language indicated a lack of experience and uncertainty sufficient to warrant the declaration of an emergency pursuant to Chapter 8 of the ATCM. Bernard J. Coogan, expert witness for plaintiff, stated that Carney's initial statement that he was "twenty seven DME miles uhh east ..." was amateurish and unprofessional.[9] H. William Barnhouse, expert witness for defendant, testified, to the contrary, that such a designation was indeed professional and provided useful information to the air traffic controller. A cassette recording of Carney's conversation with Jennings was played at trial and admitted into evidence. Additionally, the court has listened to the tape several times while the case has been under advisement. Despite Coogan's testimony, this court can find in Carney's tone of voice no basis for concluding that Jennings knew or should have known that he was uncertain or unduly anxious. In *Ross v. United States*, 640 F.2d 511, 517 (5th Cir.1981), the pilot had twice informed the air traffic controller that he was "kinda busy" and the air traffic controller had said to a co-worker, "I don't think he's ahh too sure about hisself." The court found that "the statements made by [the pilot and the air traffic controller] did not combine to warrant the initiation of emergency procedures by the tower, and, therefore, the failure of the tower to do so did not constitute negligence." A comparison of the indications of pilot distress in *Ross* and in the case before the court leads only to the conclusion that Jennings acted properly. Even if the imposition of emergency procedures were in order, the evidence does not support plaintiff's contention that a landing in Meridian would be proper. To bring an inexperienced VFR pilot from known VFR conditions to a field requiring an instrument landing at night would, in the event of tragedy, clearly be negligence on the part of the air traffic controller.

Instead of ignoring Carney's request to land at Meridian "if it's at all possible," as plaintiff argues, Jennings sought a special VFR clearance for him. In less than five minutes, not an unduly long time according to Barnhouse, he reported that the special clearance was not available. The door remained open for Carney to declare an emergency and land at Meridian despite the denial of special clearance, as Carney knew or should have known from flight training. Carney chose not to enter that door, asking instead for the "closest place." [10]

---

**9.** Coogan pointed out other terminology which, in his opinion, indicated uncertainty on the part of the pilot, including Carney's initial request for "any other help you can give us," and his repeated statements that he would "try to land." The court is of the opinion that Carney's language is not sufficient, absent other credible evidence, to prove either that the pilot was confused or that the air traffic controller breached any duty in not recognizing the alleged confusion. It should also be noted that Carney's final words, uttered at a time when plaintiff contends he was at the height of confusion and uncertainty, was "okie doke."

**10.** Coogan testified that Carney's request for the "closest place" was vague and should have elicited a request for clarification by Jennings. The court is at a loss to see any ambiguity in the request, particularly in light of the fact that neither party to the conversation exhibited any confusion as to the meaning.

Jennings then answered Carney's question and, when Carney stated that his visibility in the direction of York was "fair pretty fair", suggested that he fly toward York to see if he could get it in sight. At Carney's request, Jennings provided vectors to York and further told Carney to maintain VFR conditions and advise the air traffic controller if he were unable to do so.[11]

Plaintiff contends that the air traffic controller erred in not sending Carney to a reporting VFR airport as allegedly required by paragraph 1591 of the ATCM. It is true that, when the conversation initially focused on York airport, Jennings did not know what weather conditions existed there since York did not have weather reports available.[12] At that time, however, Jennings neither ordered nor approved a landing at York. Approaching York, Carney did know the weather conditions and, based on his representations of visibility, Jennings was entitled to rely on these statements and conclude that VFR conditions existed.[13] When Carney was ten to fifteen miles from York, he stated he had "no problem with visibility;" when the air traffic controller identified York as the "closest place," Carney stated that his visibility toward York was "fair pretty fair;" when he was seven miles south of York, Carney informed Jennings that he had to drop to sixteen hundred feet to "be able to maintain visibility." This did indicate the presence of clouds but Carney's statement further demonstrates that, after the descent, he was able to maintain visibility.[14] Carney knew or should have known his personal limitations as a pilot as well as those imposed by law; with that knowledge he, not Jennings, made the decision to land. In *Gill v. United States*, 429 F.2d 1072 (5th Cir.1970), which, according to the plaintiff's brief, has a fact situation very similar to the case before this court, the Fifth Circuit "considered ... the interplay of the government's duty to warn and the pilot's duty to fly his aircraft safely." *Id.* at 1077. The court compared its holdings in *Hartz v. United States*, 387 F.2d 870 (5th Cir.1968), in which plaintiff's plane crashed due to turbulent wake, and *United States v. Schultetus*, 277 F.2d 322 (5th Cir.), *cert. den.*, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960), in which a VFR plane crashed into another plane. In *Hartz*, the government's duty to warn was superior because of "the controller's better physical position for observation and his experience in judging the extent of peril to small planes taking off in the turbulent wake of other planes," whereas in *Schultetus*, the "superior duty [was] upon the pilot to control his own airplane in such a way as to avoid hazards when flying VFR." *Gill*, 429 F.2d at 1077. In *Gill*, the air traffic controller possessed current weather reports and yet relayed information to the pilot that was "inexact, incomplete and in all probability misleading." *Id.* The court concluded that, because the controller had superior observation facilities, experience and localized information and yet failed to apprise the pilot accurately, the case fell within *Hartz* and the government was liable. The case before this court clearly falls within *Schultetus*. Carney obviously possessed the superior observation point for determining

---

**11.** Coogan testified that this statement of Jennings was worthless during night flight because upcoming weather is not apparent. Barnhouse testified to the contrary regarding weather but did state that telling Carney to maintain VFR was unnecessary, as any VFR pilot is legally required to do so.

**12.** David Archung who testified for defendant stated that Jennings was not wrong in thinking York might have VFR conditions even though Meridian did not, as weather information at one facility is not to be used for operations at another facility. Archung noted that at one time on the night of the crash, Meridian was in instrument meteorological conditions whereas the nearby naval field was VFR.

**13.** The evidence does not indicate that York airport was in deteriorating weather or instrument meteorological conditions on the night of the crash.

**14.** Plaintiff's expert testified that, by dropping to sixteen hundred feet to maintain visibility, Carney had descended below the minimum safe altitude of 1700 feet. Further testimony established that this minimum safe altitude standard was not applicable to Carney in this situation.

weather conditions at a nonreporting field and, therefore, the superior duty. Based on the weather conditions as reported by Carney, Jennings did not breach any duty in failing to declare an emergency or in allowing Carney to land at York.[15]

As Carney approached York, he asked several times for assistance in locating the airport. Jennings gave further directions and at 0053:56 told Carney that he was right over the airport.[16] Less than twenty seconds later, Carney stated that he had the airport in sight and would try to land. Plaintiff contends that the air traffic controller's statements regarding Carney's location were inaccurate and confusing. While it appears that the statements were somewhat lacking in precision, there is no evidence that Carney was confused since he stated that he saw the airport in less than a minute and a half after his first request for location assistance.[17] Additionally, the expert pilots who testified for plaintiff and defendant testified that they too could not see the York airport until directly over it when they flew there in attempts to recreate Carney's flight.

After Carney said he saw the airport and intended to land, the conversation was then terminated by Jennings, only to be reinitiated by Carney who asked about the presence of high towers. Jennings said he knew of none [18] and then reported winds at Meridian and suggested a "right turn back" to land. The evidence showed that a right turn is less usual than a left turn, presumably because a right turn limits the vision of the pilot, who is sitting on the left side of the plane, particularly in a plane with wings below the cockpit. Any limita-

tion of vision experienced by Carney was reduced because the plane in which he was flying had wings above the cockpit. Jennings testified that he could not recall his reason for suggesting a right turn, but it was merely a suggestion and Carney knew or should have known that he did not have to follow it as he was pilot in command. Carney did so, however, without questioning either the wisdom of such a turn or his ability to carry it out.

Jennings then offered to cancel Carney's flight plan,[19] communication which, according to plaintiff, amounted to unnecessary chatter. Defendant's experts, whose testimony this court credits, stated that Jennings' offer was reasonable and not unusual and the court so finds.

The court, therefore, concludes that the air traffic controller did not breach any duty owed to the pilot. Absent evidence of mechanical malfunction, the court must conclude that pilot error of an unknown nature was the cause of this tragic accident.

The court is, therefore, of the opinion that plaintiff's complaint should be dismissed and judgment entered in favor of defendant. A separate judgment shall be entered according to the local rules.

---

**15.** The court's opinion in this respect is based on its conclusion that Carney's representations regarding visibility indicated weather conditions in which he could safely land.

**16.** Coogan stated that, when Carney was told he was right over the airport, he was forced to bank left and right in order to see the airport. Repeated banking can cause a pilot to lose sight of visual cues which can lead to spatial disorientation. Carney's statement that he could see the airport refutes any argument of disorientation.

**17.** According to the transcript, Carney initially asked for location assistance at 0053:08 and at 0054:21 stated that he had the airport in sight.

**18.** The evidence does not show that Jennings' statement was misleading or that there were towers or other obstacles in Carney's path.

**19.** When Carney initiated his flight in Albany, he filed a flight plan, which is a statement of his planned route and time of arrival. If a flight plan is not cancelled upon landing, a telephone search for the plane will be initiated within thirty minutes.