### In re GREENWOOD AIR CRASH.

**Nos. IP93–0446–C–T/G, IP93–9446–C–T/G.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 19, 1995.

Harry A. Wilson, Jr., Wilson, Kehoe & Winingham, Indianapolis, IN, for Mark & Jacque Doucey & Joyce Weliever.

James T. Crouse, Speiser, Krause, Madole & Mendelson, Mata, San Antonio, TX, for Mark Doucey & Joyce Weliever.

Richard M. Malad, Irwin B. Levin, David J. Cutshaw, Cohen & Malad, P.C., Indianapolis, IN, for June & Julie Bennett.

William L. Barr, Bell, Boyd & Lloyd, Chicago, IL, Richard Norris, Norris, Choplin & Schroeder, Indianapolis, IN, for Marianne McKinney.

F. Boyd Hovde, Townsend, Hovde & Montross, Indianapolis, IN, for Carolyn Welch, Michael Browning & Linda Carroll.

Patricia P. McCroy, Harrison & Moberly, Indianapolis, IN, for State Farm.

Kenneth D. Ross, Paul S. Newton, Ross & Harrington, Chicago, IL, for Control Systems, June Bennett & Mark Doucey.

Steven E. Springer, Kightlinger & Gray, Indianapolis, IN, J. David Hollingsworth,

John E. Birk, Hollingsworth, Meek, Miller & Pearson, Indianapolis, IN, for Solar Sources.

Stephen E. Arthur, Bose, McKinney & Evans, Indianapolis, IN, for Control Systems.

Robert E. Badger, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC, Gregory S. Winton, Office of the Chief Counsel, Federal Aviation Admin., Washington, DC, Jeffrey L. Hunter, Asst. U.S. Atty., Office of the U.S. Atty., Indianapolis, IN, for U.S.

Patrick M. Graber, Michael M. Lane, McCullough, Campbell & Lane, Chicago, IL, Richard D. Wagner, Krieg, DeVault, Alexander & Capehart, Indianapolis, IN, for Carol Mullen.

TINDER, District Judge.

## I. INTRODUCTION

This cause comes before the court upon Defendant United States of America's ("United States") motion for summary judgment on all counts pursuant to Rule 56 of the Federal Rules of Civil Procedure. Responses were filed by Carroll, Welch, McKinney, Bennett, Doucey and Weliever (Plaintiffs in this action); Solar Sources, Inc. (Defendants and Cross–Defendants); and Control Systems Engineering, Inc. (Defendants and Cross–Plaintiffs) (hereinafter collectively "Opponents"). Having considered the briefs and exhibits submitted by all parties, the court finds that the United States' motion for summary judgment should be DENIED.

## II. BACKGROUND FACTS AND PROCEDURAL HISTORY

This case involves damages arising from a mid-air collision of two aircraft. On September 11, 1994, at or about 1956:53 [1] Universal Coordinated Time ("UTC"),[2] an MU–2 aircraft, United States registration number N74FB ("MU2"), and a Piper Saratoga aircraft, United States registration number N82419 ("Piper"), collided in mid-air north-east of Greenwood Municipal Airport, Greenwood, Indiana.

Before summarizing the relevant facts, the court notes that there is a genuine issue of material fact concerning the timing of various events surrounding the crash. The timing dispute arises because there is a fifteen (15) second discrepancy between the times recorded by the voice transcript and the times recorded by the Indianapolis Air Traffic Control Tower ("ATCT") radar. Two of the Opponents [3] contend that the voice recorder was off by fifteen (15) seconds. They submit affidavits from experts in support of their assertion alleging that any other conclusion would be illogical. The United States and Solar Sources, Inc., on the other hand, contend that the radar data readout was incorrect. In support of its position, the United States submits counteraffidavits which state that the voice recorder is the only method that is not subject to variations, and, therefore, must be an accurate reflection of the timing of the events preceding the crash.

The relevance of this small window of time is fairly substantial. According to Opponents' version, the Air Traffic Controller ("ATC") had approximately thirty (30) seconds between when the MU2 first established radio contact and when the collision occurred. Additionally, Opponents contend there were twenty-four (24) seconds between when the MU2 stated that it was "off at Greenwood" before impact and nineteen (19) seconds between when the ATC gave the MU2 pilot the discrete beacon code and the collision. The United States and Solar Sources contend that the ATC only had three to eight (3–8) seconds between when the MU2 first established radio contact with him and when the collision occurred. Similarly, the other times stated by the Opponents would be decreased by approximately fifteen (15) seconds pursuant to the United States' and Solar Sources' version of the times. The relevance of this material issue of fact will be discussed more fully below. In the interest

---

1. All times will be set forth in military time.

2. UTC is the time used worldwide for air traffic control purposes and, at Indianapolis, is obtained by adding five hours to the local time.

3. Plaintiffs Carroll, et al. and Defendants and Cross–Plaintiffs Control Systems Engineering, Inc.

of clarity, the foregoing facts will be set forth according to United States' and Solar Sources' version of the timing with Opponents' time in parentheses.

Prior to 1955:57 (1955:42) UTC, the Piper had departed Terry Airport, north of Indianapolis, under Visual Flight Rules ("VFR"),[4] and had been under the radar control of the Indianapolis Terminal Radar Approach Control ("TRACON") facility.[5] The pilot of the Piper had at least three radio communications with Air Traffic Controller David Fritz ("Fritz") in which the pilot stated that he was en route to Greenwood Airport. From these communications Fritz inferred that the Piper probably intended to land there and gave relevant weather information accordingly.

At 1955:57 UTC (1955:42), Fritz terminated radar service with the Piper and authorized the pilot to change his radio frequency subsequent to determining that the pilot saw the Greenwood Airport. As of this time the Piper was no longer radar identified and being provided radar services. However, the Piper was still visible on Fritz's radar scope which also displayed the Piper's altitude. The Piper was approximately three miles away from Greenwood Airport. There were no further radio communications between the pilot of the Piper and Fritz.

At 1956:41 UTC (1956:26), approximately 44 seconds after radar services to the Piper were terminated, the pilot of the MU2 initially contacted the TRACON ATC Fritz.[6] The controller responded and, at 1956:47 (1956:32), MU2 stated, "Roger I'm off the ground Greenwood standing by for clearance to Columbus."[7] Fritz then started the process of radar beacon identification of the MU2.[8] He provided the pilot with a discrete beacon code to be programmed into his transponder and told him to activate the "ident" feature, "squawk four five six four and ident." Although the ATC chose to radar identify the MU2 through this method, the court notes that the MU2 did appear on the radar scope immediately after take off from Greenwood. Further, the court notes that the ATC had the Greenwood Airport marked on his radar scope.

After being provided with the four digit discrete beacon code, the pilot then manually inserted the code into his transponder device and activated the "ident" feature. Only after this was completed could the ground based radar antenna, which revolves once every four to five seconds, receive this discrete beacon code, process the information and display an image on the radar scope. The controller then had to locate and positively identify the computer generated data associated with the assigned four digit code on the radar scope before the aircraft could be considered radar identified, allowing the controller to provide the aircraft with radar services.

The beacon code was communicated to the pilot at 1956:51 (1956:36) and the collision occurred at approximately 1956:53 to 1956:55. The total elapsed time was thus, according to the United States and Solar Sources, less than 4 seconds, which was not enough time to complete radar identification. Therefore, ac-

---

4. VFR govern the procedures for conducting flight under visual conditions, which allow the pilot to fly from one place to another by looking out the windows of the aircraft and using his eyes to avoid other aircraft and to determine his position over the ground.

5. The Piper was under radar control at this time because it was flying within Indianapolis Metropolitan Airport's Airport Radar Service Area ("ARSA"). When a VFR pilot intends to fly within an ARSA it is required to make radio contact with an air traffic controller before flying into the controlled airspace.

6. The MU2 was to fly Instrument Flight Rules ("IFR") which means that once radar contact had been established, the ATC would direct its flight.

7. The Government's witnesses' testimony becomes divergent as to the meaning of the phrase "off the ground Greenwood," one witness, Mr. Archung, testified that the phrase could mean that the MU2 could be anywhere up to 40 miles away from Greenwood Airport. (Pl.'s Ex. D at 178.) However, Mr. Miller, another Government witness, admitted that the phrase indicates that the MU2 had just taken off from Greenwood. (Pl.'s Ex. G at 81–82.)

8. At this time, the MU2 would have been a blip on the radar scope, however, the ATC would not yet have identified that specific blip as the MU2 through the radar identification technique he chose to utilize.

cording to the United States, the MU2 was not radar identified at the time the collision occurred. However, under the Opponents' version of the timing, the total elapsed time was nineteen (19) seconds, arguably enough time to establish radar identification.[9] Therefore, there is a genuine issue of material fact as to whether the aircraft was radar identified at the time of the collision.

## III. SUMMARY JUDGMENT STANDARD

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is not genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PRO. 56(c). A party moving for summary judgment initially has the burden of showing the absence of any genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Covalt v. Carey Can., Inc.*, 950 F.2d 481, 482 (7th Cir.1991).

■ If the moving party carries this burden, the opposing party then must "go beyond the pleadings" and present specific facts which show that a genuine issue exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Becker v. Tenenbaum–Hill Assocs.*, 914 F.2d 107, 110 (7th Cir.1990). The opposing party, however, must do more than create a mere "colorable" factual dispute to defeat summary judgment; disputed facts must be outcome determinative. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *International Bhd. of Boilermakers v. Local D354*, 897 F.2d 1400, 1406 (7th Cir.1990).

■ In considering a summary judgment motion, a court must draw all reason-

able inferences "in the light most favorable" to the opposing party, *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991), and must resolve any doubt against the moving party. *Becker*, 914 F.2d at 110. Still, if the opposing party fails to meet the standard of Rule 56(c), summary judgment becomes mandatory. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson*, 477 U.S. at 248–50, 106 S.Ct. at 2510–11.

## IV. DISCUSSION

■ This action against the United States was brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* and is based upon the alleged negligence of the ATC who was on duty at the time of the mid-air collision. Both the accident itself and the ATC were located in the Southern District of Indiana. Therefore, the substantive law of the State of Indiana will control these proceedings. 28 U.S.C. § 1346(b); *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

■ In an action for negligence, a plaintiff must show that the defendant owed the plaintiff a duty arising from their relationship, that the duty was breached, and that the breach was the proximate cause of the plaintiff's injury. *Claxton v. Hutton*, 615 N.E.2d 471, 474 (Ind.Ct.App.1993); *Board of Comm'rs of Monroe County v. Hatton*, 427 N.E.2d 696, 698 (Ind.Ct.App.1981). Absent a duty, there can be no negligence. *Strauss Veal Feeds v. Mead & Hunt, Inc.*, 538 N.E.2d 299, 303 (Ind.Ct.App.1989). The existence of a duty is a question of law for the court to determine. *Claxton*, 615 N.E.2d at 474. The sole basis for the United States' summary judgment motion is that the ATC owed no duty to issue a warning to either plane because he was not providing radar services to either aircraft at the time of the collision.

An air traffic controller's duties to pilots are defined by both Federal Aviation Administration ("FAA") Order 7110.65G Air Traffic Control ("Manual") and common law. These two bodies of law define the responsibilities

---

**9.** Only one of the parties opposing summary judgment asserts that the MU2 was radar identi-

fied at the time of the collision. (*See* Resp.Br. of Solar Sources, Inc. at 2 & 9.)

and duties an air traffic controller must follow in the course of his job. The source of the legal duty to issue a warning pursuant to each area of law will be discussed and then the court will address the scope of the duty.

## A. Duty Based Upon FAA Order 7110.65G

As stated above, FAA Order 7110.65G prescribes the procedures an air traffic controller must follow in the course of his job. The United States argues that pursuant to this Manual, the ATC owed no duty to either plane because neither plane was radar identified at the time of the collision. The parties opposing summary judgment argue that: first, the ATC had a duty to radar identify the MU2 in an alternative, more timely manner; second, the MU2 may have been radar identified at the time of the collision; and third, even if the aircraft were not radar identified, the Manual also creates a more general duty to issue warnings to non-radar identified aircraft.

First, as to the contention that an alternative radar identification method should have been used, Opponents argue that the ATC should have been watching his radar screen and radar identified the plane from take-off (as set forth in 7110.65G ¶ 5–51) rather than using the discrete beacon code method. There is no basis to find a duty to utilize one method over another based upon the Manual itself. However, if the ATC had a duty to warn the MU2 of the collision based upon other provisions of the Manual or based upon common law, and radar identifying the aircraft by viewing it taking off would have aided him in the execution of that duty, perhaps the ATC should have radar identified the MU2 in this other way. This issue is relevant to breach of the legal duty rather than the existence of a duty, and thus will not be determined by the court on summary judgment.

■ Second, there is a genuine issue of fact as to whether the MU2 was radar identified at the time of the collision based upon the dispute regarding the time of the events preceding the collision. If the MU2 was radar identified, the ATC would have a duty to issue a safety alert pursuant to § 2–6 of the Manual. Safety alerts are only issued to

aircraft under the ATC's control (Definition of "Safety Alert", Pilot/Controller Glossary (June 25, 1992)).

### 2–6 SAFETY ALERT

Issue a safety alert to an aircraft if you are aware the aircraft is at an altitude which, in your judgment, places it in unsafe proximity to ... other aircraft. Once the pilot informs you action is being taken to resolve the situation, you may discontinue the issuance of further alerts. Do not assume that because someone else has responsibility for the aircraft that the unsafe situation has been observed and the safety alert issued; inform the appropriate controller.

2–6 Note 1.—The issuance of a safety alert is a first priority (see paragraph 2–2) once the controller observes and recognizes a situation of unsafe aircraft proximity to ... other aircraft. Conditions, such as workload, traffic volume, the quality/limitations of the radar system, and the available lead time to react are factors in determining whether it is reasonable for the controller to observe and recognize such situations. While a controller cannot see immediately the development of every situation where a safety alert must be issued, the controller must remain vigilant for such situations and issue a safety alert when the situation is recognized.

This section establishes a duty to issue a safety alert to radar identified aircraft when facts and circumstances warrant it.

More generally, paragraphs 2–2(a) and (b) state that the primary duty of all ATCs is to maintain separation of aircraft. This duty exists no matter what the ATC is doing in the course of his work. Although this duty is not exact or well-defined, it does provide a framework upon which to place other more specific duties of the ATC.

■ In addition to this general duty, one of the duties defined in the Manual is the duty to issue traffic advisories. Traffic advisories are defined in the Manual as:

Advisories issued to alert pilots to other known or observed air traffic which may be in such proximity to the position or intended route of flight of their aircraft to

warrant their attention. Such advisories may be based on:

1. Visual observation.

2. Observation of radar identified and nonidentified aircraft targets on an ATC radar display, or

3. Verbal reports from pilots or other facilities....—Traffic advisory service will be provided to the extent possible depending on higher priority duties of the controller or other limitations, e.g., radar limitations, volume of traffic, frequency congestion, or controller workload. Radar/nonradar traffic advisories do not relieve the pilot of his responsibility to see and avoid other aircraft. Pilots are cautioned that there are many times when the controller is not able to give traffic advisories concerning all traffic in the aircraft's proximity; in other words, when a pilot requests or is receiving traffic advisories, he should not assume that all traffic advisories will be issued.

(Definition of "Traffic Advisories," Pilot/Controller Glossary (June 25, 1992)). The Manual further states that an ATC shall:

2–21 TRAFFIC ADVISORIES

"[i]ssue traffic advisories to all aircraft (IFR or VFR) ... where no separation minima applies, such as for VFR aircraft outside an ARSA ... issue traffic advisories to those aircraft on your frequency when in your judgment the proximity warrants it." Provide this service as follows:

(a) to radar identified aircraft;

(b) to aircraft that are not radar identified

(Manual ¶ 2–21). The Manual encompasses the situation this ATC was faced with, since he had aircraft flying either IFR or VFR (an issue of material fact) outside the ARSA, the MU2 was on the ATC's frequency and the aircraft were in close proximity to each other. In such situations there is a duty to issue a traffic advisory because an ATC is required to give all warnings specified in the Manual. *Davis v. United States,* 824 F.2d 549, 550 (7th Cir.1987).

In a case similar to the one at bar, a district court found an ATC had a legal duty to issue a traffic advisory as stated in the Manual. In *Frutin v. Dryvit Systems,* 760 F.Supp. 234 (D.Ma.1991), the court found a duty to warn where the ATC was in contact with one pilot and was arguably able to see the other plane on his radar. "Once the Navajo had made radio contact with ATC, the government's discretionary function under VFR ceased, the government's role rose to operational level." *Id.* at 237. The court found liability based upon the fact that even though the plane was flying VFR at the time, the pilot was in radio contact. "When a plane is in contact with ATC, the FAA tells the pilot that the controller's primary duty is to separate the plane from other aircraft." *Id.* at 236. The case at bar is similar to *Frutin* in that the ATC was in radio contact with the MU2 and not only was the Piper arguably still visible on the radar scope, ATC Fritz had just terminated radio contact with the Piper and knew the destination of the Piper. In such situations the ATC has a duty to issue a traffic advisory if a reasonable air traffic controller in the same situation would do so.[10]

**B. Duty Based Upon Common Law**

An ATC's legal duty to issue a warning may also be found in common law. Common law recognizes a duty that is more broad than the duty set forth in the Manual in certain instances. Courts have recognized this duty based on the tort principle that "once the Government has assumed a function or service, it is liable for negligent performance." *Davis,* 824 F.2d at 550–51 (quoting *Spaulding v. United States,* 455 F.2d 222, 226–7 (9th Cir.1972)). The Government cannot limit this liability solely by relying on the Manual. As one court stated: "we disapprove the view that the duty of an FAA controller is circumscribed within the narrow limits of an operations manual and nothing more." *Hartz v. United States,* 387 F.2d 870, 874 (8th Cir.1968). The Seventh Circuit has defined this duty as follows:

The air traffic controller is required to give all information and warnings specified in

---

**10.** See *infra* Section III.C. for a discussion of the scope of the ATC's duty.

his manuals, and in certain situations he must give warnings beyond the manuals. (When danger is immediate, extreme, or known only to federal personnel; when the controller is better qualified to evaluate a given situation or make more accurate observations than the pilot.)

*Davis,* 824 F.2d at 550 (quoting *Spaulding,* 455 F.2d at 226–27). This situation is one where the danger was immediate and extreme, and therefore a legal duty exists beyond that which is defined in the Manual.

A review of law in this area reveals an array of findings as to whether an ATC's duty to maintain separation of aircraft is nullified when planes are flying VFR. Courts that find nullification base it upon the pilot's duty to maintain separation of aircraft. An example of cases that find nullification is *Redhead v. United States,* 686 F.2d 178, 183 (3d Cir.1982), *cert. denied,* 459 U.S. 1203, 103 S.Ct. 1190, 75 L.Ed.2d 435 (1984), which states that the ATC has no duty to warn of situations that the pilot should already be aware of based on his training, experience, and personal observations. *Id.; See also In re N–500L Cases,* 691 F.2d 15, 28 (1st Cir. 1982); *McDaniel v. United States,* 553 F.Supp. 910, 916 (N.D.Cal.1982) (finding no duty on part of ATC to issue traffic advisory to VFR pilot based upon elevation above dangerous terrain).

██ However, the more reasoned and prevailing view is that the ATC and the pilot have concurrent duties to maintain separation of aircraft. *Davis,* 824 F.2d at 551; *Arnold v. Eastern Air Lines, Inc.,* 681 F.2d 186, 194 n. 8 (4th Cir.1982), *cert. denied sub nom. Aetna Casualty & Sur. Co. v. United States,* 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983); *Mattschei v. United States,* 600 F.2d 205, 208 (9th Cir.1979); *Spaulding,* 455 F.2d at 226; *Hartz,* 387 F.2d at 873; *Webb v. United States,* 840 F.Supp. 1484, 1511 (D.Utah 1994); *Frutin,* 760 F.Supp. at 236–37; *Baker v. United States,* 417 F.Supp. 471, 485 (W.D.Wash.1975). In *Mattschei,* the court stated "while ultimate responsibility for the safe operation of aircraft rests with the pilots, regardless of air traffic clearance the duty to exercise due care to avoid accidents is a concurrent one

resting on both control tower personnel and the pilot." *Mattschei,* 600 F.2d at 208 (citations omitted). Similarly, in *Webb,* the court stated:

> In airplane tort cases, the pilot and FAA personnel ... are burdened with concurrent duties of due care for the protection of the aircraft and its occupants. Because both are responsible for the safety of the aircraft, negligence on the part of the pilot does not automatically relieve FAA personnel of their duties of care.

*Webb,* 840 F.Supp. at 1511 (citations omitted). Thus, in this case the court finds that the ATC's duty to issue a warning was not nullified by the pilots' own duties to maintain separation from aircraft.

### C. Scope of the ATC's Duty

The scope of the legal duty setting forth when an ATC must issue a warning is not well defined in the ATC Manual, however, case law fleshes out the scope of this duty. The duty, though easily defined in general terms, is very fact specific and will probably require different action in every circumstance. The nature of the duty is defined by what the ATC knew at the time of the alleged breach.

██ An ATC has a duty to issue all warnings that a reasonable ATC would issue under the same circumstances. *Biles v. United States,* 848 F.2d 661, 664 (5th Cir. 1988); *Spaulding,* 455 F.2d 222; *Hartz,* 387 F.2d at 873; *Webb,* 840 F.Supp. at 1515; *Frutin,* 760 F.Supp. at 236–37; *Baker,* 417 F.Supp. at 485. "Certainly the controller must assist even careless pilots who, based on the facts known to the controller, have placed themselves in a dangerous position ... [but only in situations where the controller could have known that the] aircraft was subject to dangerous conditions." *Biles,* 848 F.2d at 664 (finding no duty on the part of the ATC because she did not know about the dangerous weather conditions 15 miles away or that minimum VFR conditions were insufficient). Thus, in *Spaulding,* 455 F.2d 222, the court found that where the ATC knew or had reason to know about the likelihood of the crash, the ATC must issue a traffic advi-

sory. *Id. See also Frutin*, 760 F.Supp. at 236–37.

 In virtually every case what a reasonable ATC would do in the defendant's position will necessarily need to be established through expert testimony. Factors that will be relevant to such a determination will include considerations set forth in the Manual. (*See* Manual ¶¶ 2–6 & 2–21.) These would include: higher priority duties of the ATC, radar limitations, volume of traffic, frequency congestion and controller workload. Although this is certainly not an exclusive list of considerations, these factors would be relevant to such a determination.

 In summary, the court finds that ATCs owe a legal duty of reasonable care to issue warnings. However, whether this duty has been breached is a question of fact which is dependent upon what a reasonable ATC would have done in Defendant's position. Therefore, summary judgment is denied.

**D. Issues Not Resolved on Summary Judgment**

 The United States moves for summary judgment solely upon the basis that ATCs owe no legal duty to pilots unless the aircraft are radar identified. However, the law supports a finding that an ATC does owe such a legal duty to non-radar identified planes. Furthermore, there is a genuine issue of material fact as to whether the MU2 was radar identified. However, finding such a duty is still a long way from finding liability on the part of the United States. Several issues remain undecided. First, as set forth above, whether there has been a breach of the duty of reasonable care has not been decided.

Second, a genuine issue of material fact remains as to whether the radar recording or the voice transcript reported the accurate times of the communications prior to the collision. The resolution of this material fact will help establish whether the ATC breached his duty to the pilots. If the ATC was only in radio contact with the MU2 for 3–8 seconds before the collision occurred, it is unlikely that a reasonable ATC would be able to issue a warning within that time. Furthermore, the timing is relevant to the issue of proximate cause. Again, if the United States' version of the time is correct, it is unlikely that the pilot of the MU2 would have had enough time to respond and prevent the collision.

 Another important issue relevant to the liability of the United States is the comparative fault of the pilots of both the Piper and the MU2. The primary duty to maintain separation of aircraft rests with the pilots themselves. This duty is concurrent with the ATC's duty. Therefore, the relative negligence of other parties will be relevant to the determination of liability of the ATC.

**V. CONCLUSION**

The United States has failed to prove that an ATC owes no legal duty to the pilots in this case. The court finds a legal duty and material issues of fact as to the breach of that duty. Therefore, Defendant United States' summary judgment motion is hereby **DENIED.**

ALL OF WHICH IS ORDERED.