Martin John BEATTIE, et al.,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 82–3520.

United States District Court,
District of Columbia.

July 7, 1988.

Juanita M. Madole, Joseph T. Cook, Speiser, Krause & Madole, Washington, D.C., Speiser, Krause & Madole, Santa Ana, Cal., for plaintiffs.

Debra J. Kossow, Sr. Trial Atty., Jan K. Von Flatern, Asst. Director, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant; Lt. Barbara Swift, Office of the Judge Advocate General, U.S. Dept. of Navy, Alexandria, Va., of counsel.

OPINION

HAROLD H. GREENE, District Judge.

This lawsuit charges United States Navy air traffic controllers stationed at McMurdo Naval Station on Antarctica with responsibility for the loss of life sustained in the most serious air disaster in the history of New Zealand, when an Air New Zealand DC–10 passenger aircraft crashed into Mt. Erebus, killing all 237 passengers and 20

crew members.[1] The issue before the Court is whether negligence by the air traffic controllers caused or contributed to the crash.[2]

## I

### Background

Since geography plays an important part of this case, it is appropriate first to give a short description of the pertinent Antarctic geographical features. For a better understanding of these features and of the various flight routes, *see infra*, a sketch of the relevant area is included as an appendix to this Opinion.

Ross Island, a part of the Antarctic continent, is located at a point where the Ross Sea meets the permanent ice shelf which extends toward the South Pole. The southwest corner of Ross Island consists of a long, narrow peninsula at the end of which are located two permanent scientific bases, one of them McMurdo Station.[3] McMurdo is the headquarters and major base for the United States Antarctic Research Program (USARP) which is operated by a division of the National Science Foundation. Ross Island is separated from the landfall to the west, known as the Victoria Land Coast, by McMurdo Sound, approximately 42 miles wide. The Sound is an open flat area of sea ice without any significant obstructions or protrusions.

The United States Navy, operating as the Naval Support Force Antarctica (NSFA), is charged with providing logistical support to the National Science Foundation in the conduct of its research program efforts. The logistical support programs conducted by the Navy in Antarctica are also known under the nickname Operation Deep Freeze.

Among other facilities, the Navy operates the Williams Field Ice Runway which is located somewhat less than three miles south southeast of McMurdo Station.[4] In connection with its operation of Williams Field and other landing areas, two air traffic control facilities are maintained at McMurdo Station: McMurdo Air Traffic Control Center, generally known as Mac Center, and Williams Field Ice Runway Tower/Ground Control Approach Facility, usually referred to as Ice Tower. These

---

**1.** The initial question, disposed of by the Court on motions in 1984, was whether suit could be brought against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, based upon the alleged negligence of U.S. Navy personnel on the Antarctic continent. Section 2680(k) exempts from the coverage of the Act "any claim arising in a foreign country," and the issue before the Court was whether the site of the crash qualifies for that exception.

Antarctica is clearly not a foreign country. In fact, it is not a country at all, nor does it contain any country. The continent is unique on the surface of the earth in not being subject to the sovereign rule of any nation. Plaintiffs contended that, since the claim did not, literally, arise in a foreign country, the exemption does not apply, and it follows that the Act does. On the other hand, Antarctica is not a part of the United States, and it could be argued—as the government did—that Congress could not have meant to allow suits in areas where the United States lacks sovereignty and jurisdiction.

Without going into detail, this Court ultimately decided, for a variety of reasons, that the Federal Tort Claims Act does apply to Antarctica. *Beattie v. United States*, 592 F.Supp. 780 (D.D.C.1984). However, since this was plainly a case of first impression, and since there existed a controlling question of law as to which there was substantial ground for difference of opinion, the Court certified the case to the Court of Appeals for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The appellate court ultimately agreed with this Court on the applicability of the Federal Tort Claims Act, *Beattie v. United States*, 756 F.2d 91, 98 (D.C.Cir.1985), and the matter accordingly came back here for trial.

**2.** With respect to questions of contributory negligence and contributing causes in circumstances such as these with respect to individuals other than the operational crew, *see generally Pierce v. United States*, 679 F.2d 617, 622–23 (6th Cir.1982) (negligence of a pilot not imputed to passengers); *Rudelson v. United States*, 602 F.2d 1326, 1330 (9th Cir.1979) (more than one proximate cause); *Wasilko v. United States*, 300 F.Supp. 573, 599 (N.D.Ohio 1967), *aff'd*, 412 F.2d 859 (6th Cir.1969).

**3.** The other is Scott base operated by New Zealand, a scientific station similar to McMurdo, except that it has no radar capability.

**4.** The ice runway is a landing strip scraped into the ice shelf every year for use by wheeled aircraft during the three to four month period when the ice will bear the weight of an airplane.

facilities communicate with each other by FM radio.

Mac Center provides enroute flight guard, enroute flight following, air traffic control, and advisory service for aircraft operating south of sixty degrees south latitude.[5] Mac Center has HF (high frequency), VHF (very high frequency), and UHF (ultra-high frequency) radio communications equipment for use in communicating with aircraft. The Center has responsibility for IFR (Instrument Flight Rules) separation of inbound aircraft[6] until the aircraft are approximately 100 miles from the station, at which time control and responsibility are transferred to Ice Tower.

Ice Tower provides VFR (Visual Flight Rules) terminal advisory service and air traffic control for aircraft operating on the ice runway (as well as for fixed wing airborne aircraft operating in the airport traffic area). Ice Tower is equipped with a Quad radar which includes an Airport Surveillance Radar (ASR) as well as a secondary radar.[7] Inbound aircraft are normally radar-identified by Ice Tower through the use of this secondary radar when within 100 miles out. However, direct guidance is possible only within 40 miles or less of Ice Tower by means of the primary ASR. *See* p. 1075, *infra.* Radio communications with Ice Tower are through UHF and VHF frequencies.

The ordinary route used by military aircraft toward McMurdo proceeds from New Zealand[8] down the center of McMurdo Sound. As the head of the Sound draws near, the descending aircraft turns left, that is, east, so as to line up with a McMurdo landing field, ultimately to land there. Air New Zealand's sightseeing flights—of which the ill-fated Flight 901 was one—would likewise fly to the head of McMurdo Sound, turn left, and then overfly the flat ice shelf south of McMurdo Station and Scott Base at low altitude so as to afford the passengers a clear look at the scientific bases and the surrounding territory. These sightseeing flights would then turn around, fly again past the bases, and up McMurdo Sound northward back toward New Zealand.

Some of the flights took a more direct route to McMurdo, in the process overflying Ross Island itself, but they did so at a suitably high altitude to avoid the mountainous terrain on that island. The first of the two principal mountains an aircraft encounters on the way from the north along that route is the 5,380 foot Mt. Bird, the second, about fifteen miles further south, the 12,450 foot Mt. Erebus.

The accident which is the subject of this lawsuit occurred when Flight 901 crashed into Mt. Erebus. The crash was the consequence of the combined effect of two deviations from the proper route: if the crew of Flight 901 intended to use the McMurdo Sound route, it was about 26 miles too far east; if it intended to fly directly over Ross Island, it was several thousand feet too

---

5. Pursuant to the manual which prescribes the furnishing of these services, they are required to be provided only for scientific aircraft that are part of Operation Deep Freeze. *See also* note 25, *infra.*

   Above sixty degrees south, aircraft services are furnished by New Zealand.

6. This responsibility exists also to the extent that Mac Center undertakes to assist other aircraft. *See generally,* Part III, *infra.*

7. The Quad radar at Ice Tower had been retrofitted to have an IFF/SIF function (Identify Friend or Foe) which, when working properly, operates as a secondary radar to extend the range of the Airport Surveillance Radar. Inbound aircraft can be radar identified by Ice Tower through the use of IFF when within about 100 miles of McMurdo Station and at an altitude between the ground and 40,000 feet, without manipulation of the radar beam by the controller. The purpose of the IFF is to obtain a general idea, within several miles, where an aircraft is located.

   The IFF works in the following way. The ground station transmits a coded signal to an airborne device known as a transponder. The transponder contains a receiver which evaluates the coded signal and a transmitter which returns a coded signal to a ground-based receiver. If received, the signal is processed and displayed as a "slash" on the radar screen. The advertised range of the IFF at McMurdo was 200 miles, with an actual range of about 100 miles. The machine at Ice Tower was temperamental, making its performance erratic, more erratic, in fact, than radio communications.

8. New Zealand is some 2,400 miles north of Ross Island over the open sea.

low.[9] The basic question in this lawsuit is: who [10] was responsible for these mistakes?

## II

### *Negligence of Air New Zealand and of the Crew of Flight 901*

Were it not for the tragic outcome, the planning phase of Flight 901 could be described as a comedy of errors; some of these errors were perpetrated by Air New Zealand,[11] others by members of the flight crew.

On November 9, 1979, nineteen days before the flight, Captain James Collins,[12] who was to be in command of Flight 901, his First Officer Gregory Mark Cassin, and other members of the crew, attended a briefing conducted by one of Air New Zealand's officials. The briefing included the circulation of a sample flight plan which directed Flight 901 to approach the McMurdo Station area by way of the customary route down the center of McMurdo Sound, followed by an eastward turn.[13]

However, Air New Zealand also presented slides at the November 9 briefing which demonstrated the direct route to Ross Island, and it distributed files which contained the coordinates for a flight by way of that route. Additionally, on the morning of the flight, airline management handed out the official flight plan for Flight 901 containing those same coordinates, and the flight crew entered these coordinates on the aircraft computer. Compared to the sample flight plan of November 9, 1979, these later documents moved Flight 901 26 miles to the east, on a course directly toward Ross Island and, indeed, straight toward Mt. Erebus. A collision with Mt. Erebus was to be averted by having the aircraft fly at an altitude in excess of 16,000 feet.

Although, as indicated above, Captain Collins was ultimately given papers showing the Mt. Erebus route for the flight, he was not orally informed of the change in course. However, since the crew had in hand the flight plan with the "Mt. Erebus" coordinates, if any member of the crew had plotted these coordinates on a map, he would have known that the aircraft's computer was taking the flight directly toward Ross Island and its peaks. Nevertheless, Captain Collins and his crew continued to assume that they were flying down the center of McMurdo Sound over flat sea ice.

The problems which ensued, and the ultimate disaster, flowed directly from the events described above.[14] Additionally, the operational crew of Flight 901 acted unreasonably [15] during the flight in at least the following respects.

First, the crew did not, at any time during the flight, plot the aircraft's actual position from its aerial inertial guidance system (AINS); had it done so, its mem-

---

**9.** For a fuller description of these events, *see* Part IV, *infra*.

**10.** The parties have stipulated that no mechanical defects or malfunctions of the aircraft caused or contributed in any way to the crash. Thus, the failure was human.

**11.** The parties have stipulated to the negligence of Air New Zealand.

**12.** Captain Collins was an experienced, very highly-regarded officer, with 11,151 hours of flying time, 2,872 hours on DC–10 aircraft. He had no flying experience in Antarctica, however.

**13.** This is the route which Captain Collins and the rest of the crew had in mind as a result of the briefing. On the night before the flight, Captain Collins apparently plotted this course down McMurdo Sound at his home in the presence of his daughter on an atlas they owned.

All but two of the previous sightseeing flights had also used this route.

**14.** It is not necessary for the Court to resolve the question as to who had the major responsibility for the misunderstandings, for it is evident, in any event, that the McMurdo air traffic controllers had no part in them.

**15.** Plaintiffs argue, albeit without a great deal of conviction, that only the ground controllers were negligent, and that the crew of Flight 901 was without any fault whatever. Plaintiffs' proposed conclusion of law number 32 states: "The actions of the cockpit crew of flight 901 were in all respects proper crew procedures, good piloting practice and proper use of available instrumentation, personnel and other resources." As discussed in the text, this proposed conclusion is entirely in error.

bers would have known precisely where they were located and that they were approaching Ross Island or were over it, rather than over the open McMurdo Sound.

Second, alternatively, or in addition to the AINS, the position of Flight 901 could have been ascertained at any time during the flight by means of the aircraft's airborne radar; that, too, would have provided the crew, long before the crash, with a fix on where the aircraft was located and where it was headed. No such radar search was made.

Third, Flight 901 descended below 16,000 feet, contrary to both prudent airmanship and Air New Zealand policy,[16] without first ascertaining what was there or following the other requirements for such descent. In fact, according to the witness John Paulus who flew his aircraft into McMurdo from the south at the same time as when Flight 901 was proceeding toward the Station from the north, arriving about thirty minutes after the crash, Mt. Erebus was perfectly visible even from a high altitude.

Fourth, Beaufort Island, a prominent landmark north of Ross Island traditionally used for aerial navigation, appeared to the right of Flight 901 rather than to the left as it should have been had the flight proceeded down McMurdo Sound as the crew assumed; yet this faulty location with respect to an obvious landmark[17] did not alert the crew to its erroneous course.

Fifth, in the face of deteriorating meteorological conditions, culminating ultimately in a whiteout, see p. 1082, infra, Flight 901 proceeded resolutely ahead on its course rather than to seek an alternate destination.

Sixth, five or six persons were milling around in the cockpit during the critical period, and passengers were also present or nearby, causing some distraction. Moreover, use could have been made of several of the more or less idle crew members for the performance of such tasks as navigation, communication, and radar control.

In short, in addition to the negligent actions of Air New Zealand with respect to planning, much of the responsibility for the disaster rests with the crew of Flight 901 for actions it took in the course of the flight.[18]

The Court now turns to the principal subject of this litigation—were the air traffic controllers also negligent, and was their negligence a proximate cause of the disaster?[19]

### III

### *Duty of the United States to the Plaintiffs*

Although there are other claims of negligence, the principal substantive claim is that the personnel at McMurdo Station offered radar guidance to Flight 901 but failed to deliver on that promise after the crew of the aircraft had accepted.

Under District of Columbia law, the elements necessary to sustain a claim for negligence are a duty owed by the defendant to the plaintiff to exercise reasonable care, and injury to the plaintiff proximately

---

**16.** Flight 901 was pre-programmed to fly at an altitude of 30,000 feet. The pilot's decision to descend below 16,000 feet when he did was in violation of Air New Zealand's official overflight procedures which permitted an aircraft to descend below 16,000 feet (to as low as 6,000 feet) only in the following circumstances: the crew was able to see where it was going, visual meteorological conditions (VMC) were present, or the crew had access to a non-directional beacon (NDB) in instrument meteorological conditions. Furthermore, in order to avoid Mt. Erebus and other mountainous areas on Ross Island, descent to 6,000 feet was restricted to an area south of McMurdo Station. *See* Letter dated August 10, 1977 from Air New Zealand to New Zealand Civil Aviation Division specifying stan-

dard operating procedures it intended its crews to follow on all overflights. Several of the conditions referred to in the letter were not present when Flight 901 descended below 16,000 feet.

**17.** Beaufort Island is some 2,500 feet in elevation, with sheer cliffs that rise abruptly from the sea.

**18.** For additional acts of negligence more directly intertwined with the allegations against the controllers, *see* Part VI–B, *infra*.

**19.** If so, at least those on the aircraft other than the operational crew have a valid claim against the United States, the controllers' employer. *See* note 2, *supra*.

caused by defendant's breach. *See, e.g., District of Columbia v. Fowler,* 497 A.2d 456 (D.C.App.1985). The Court accordingly must consider initially whether the United States Navy owed any duty to Flight 901 and to these plaintiffs.[20] *District of Columbia v. Cooper,* 483 A.2d 317, 321 (D.C. App.1984).

There was here no formal undertaking, such as a contract, which would have given rise to such a duty. However, liability can also be predicated upon reliance by the plaintiff upon an informal undertaking by the defendant, gratuitously or for consideration, to render services, followed by a failure to use reasonable care in performing the services. Restatement (Second) of Torts §§ 323, 324A; *In Re Korean Airlines Disaster of September 1, 1983,* 646 F.Supp. 30 (D.D.C.1986); *Clemente v. United States,* 567 F.2d 1140 (1st Cir. 1978).[21]

The evidence established that in the mid–1970's, Air New Zealand initiated negotiations with its nation's appropriate governmental authorities for approval of non-stop civilian sightseeing flights over Antarctica. These flights were to originate in Auckland, New Zealand, overfly Antarctica in the vicinity of McMurdo and Scott Stations, and conclude in Christchurch, New Zealand. The New Zealand government approved such flights in January, 1977.

Since, as indicated in note 1, *supra,* the airspace over Antarctica is not subject to the sovereignty of any nation, the New Zealand authorities could lawfully permit the proposed overflights without consulting any other government. However, the United States Navy operates at McMurdo Station, the only air traffic control facility in the area intended to be overflown, and representatives of Operation Deep Freeze were therefore included in discussions and correspondence regarding the proposed flights.

As noted above, McMurdo Station is headquarters for USARP, a civilian agency under the aegis of the National Science Foundation. The McMurdo air traffic control facility itself is not a civilian operation, however. To the contrary, it is staffed by military personnel trained to guide military aircraft, and it exists solely to provide logistical aid to military aircraft involved in scientific research in Antarctica.[22]

The United States Navy could not and did not prohibit the Air New Zealand overflights or mandate that the aircraft follow any particular flight route or procedure. At the same time, however, the Navy did not encourage the sightseeing flights. Indeed, because of the harsh environment and the limited resources available, all the Antarctic Treaty Nations, including the United States and New Zealand, had adopted a policy of discouraging civilian expeditions.

Along the same lines, the Commander of NSFA informed Air New Zealand, through established channels, that Navy air traffic controllers located at McMurdo Station could provide only limited support for the proposed civilian overflights,[23] and he repeatedly advised the New Zealand airline that McMurdo Station air traffic controllers could provide air traffic control, flight following, and weather forecasting support only on a limited basis and for advisory information only.[24] Thus, NSFA advised

---

**20.** The plaintiffs are the heirs and beneficiaries of the estates of sixteen crew members of Flight 901 who died as a consequence of the crash.

**21.** With respect to the duty of the United States, *see Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *see also Berkovitz v. United States,* —— U.S. ——, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

**22.** The evidence indicates that if no scientific activity was planned for a particular day, the Ice Tower air traffic control systems would not be operated at all. They would not be placed in operation for a civilian flight such as Flight 901.

**23.** Civilian aircraft are in uncontrolled space below a latitude of sixty degrees south. Pursuant to the rules of the International Civil Aviation Organization, of which both the United States and New Zealand are members, civilian air traffic controllers in Auckland, New Zealand, provide air traffic services north of sixty degrees south.

**24.** The Navy has also claimed at various times that the provision of air traffic information to civilian aircraft was motivated only by a concern for the safety of the Operation Deep Freeze aircraft whose operations would be endangered

the New Zealand Civil Aviation Division in 1978 that "air traffic control/flight following services will be provided on a not-to-interfere basis, by qualified U.S. Navy air controllers, but will be limited to location advisory of Deep Freeze aircraft and position relay."[25]

All that having been said, it is still a fact that, at least when this did not interfere with its own operations, and when its personnel were not otherwise occupied, United States naval personnel did customarily provide additional services to civilian aircraft in the region, and that this practice was well known to those who, like Air New Zealand personnel, operated with some frequency in the region. NFSA in fact requested civilian aircraft commanders to "advise McMurdo Center of any intended altitude change, maintaining VMC in all climbs and descents, and comply with all instructions issued in the interests of aircraft separation."

Such a request would have been unnecessary if United States naval personnel intended simply to turn their backs on civilian aircraft operating in the vicinity of McMurdo. It is to its credit that the Navy took this humanitarian approach, but that is what it did, and the legal requirement of due care when services were reasonably expected followed from this Navy policy. *See* the authorities cited at p. 1073, *supra.*

It is the Court's conclusion that no legal duty ran from the United States Navy to civilian aircraft to furnish air traffic control services on a routine basis. It is also the Court's conclusion, however, that if with respect to a particular flight, such as Flight 901, Navy personnel led the crew of the aircraft to believe that certain services would be forthcoming, such personnel had the duty to exercise reasonable care with respect to the manner in which these services were rendered.

## IV

### *Communications Between The Aircraft And The Ground*

At approximately 12:18 p.m.,[26] on November 28, 1979, Captain Collins commented to others in the cockpit of the DC-10 which was approaching Antarctica that it was very hard to tell the difference between the clouds and the ice.[27] At about the same time, Mac Center informed the aircraft crew that there was an extensive low overcast with light snow at McMurdo, but that the visibility was still about 40 miles. Mac Center further stated that the skies were clear over the valleys on the west coast of McMurdo Sound, 75–100 miles northwest of McMurdo. Scott Base confirmed this weather report. Even though the crew of Flight 901 recognized that the conditions at McMurdo did not look "very promising," it decided to approach

---

by the presence of unidentified aircraft flying at unknown altitudes and locations.

**25.** The Naval Support Force Antarctica Air Traffic Facility Manual establishes a duty on the controllers to respond to all requests for air control services, except in the event of equipment failure or personnel inadequacies, of their own. Here again, *see* note 5, *supra,* the manual governs only scientific air operations that are part of Operation Deep Freeze.

**26.** Time references herein are to local time which differs by twelve hours from Greenwich Mean Time.

**27.** Flight 901 was equipped with a cockpit voice recorder (CVR) which was recovered intact from the wreckage. The CVR provides a record of conversations to and from the aircraft, as well as within the cockpit, during the last 30 minutes of flight, beginning at 12:17 p.m. It recorded communications from microphones at the captain's, co-pilot's, and flight engineer's stations as well as from a cockpit area microphone. A transcript of those communications was prepared by Ronald Chippindale, Chief Inspector of Air Accidents in the Office of Air Accidents Investigation, Ministry of Transport, New Zealand, and is included as an annex to his report. *See* note 82, *infra.* The time references in the transcript are to Greenwich Mean Time, and they include seconds as well as minutes. A handwritten transcript was also prepared by a team formed for that purpose during the initial stages of the Chief Inspector's investigation.

The ground to air communications between Flight 901 and the air traffic controllers were also recorded at McMurdo, transcripts of the full hour of those communications were prepared, and their accuracy was stipulated. The Court has read the transcripts and listened to a cassette recording of the CVR tape.

McMurdo Station, probably because of its sightseeing interest.[28]

A few minutes after these broadcasts, at about 12:20 p.m., in what is perhaps the most critical exchange of communications insofar as this litigation is concerned, Mac Center, the general communications center[29] at McMurdo Station, informed Flight 901 by HF radio of the possibility of radar assistance, as follows:

> ... within a range of forty miles of McMurdo we have a radar that will, if you desire, we can let you down to one thousand five hundred feet on radar vectors[,] over.

The crew responded, "Roger New Zealand 901 that's acceptable."[30] There is a dispute as to the meaning of this exchange of messages. Captain Gordon Vette, former captain of Boeing 747 aircraft and now a flight instructor, who was one of plaintiff's expert witnesses,[31] testified that this communication established full radar coverage for the flight. Other evidence, particularly that of Captain Daniel Mannighan and that of Ray Priest, experts called by defendant, much more credibly interpreted the 12:20 message as merely communicating to Flight 901 that, *if* the crew wanted to descend down as far as 1500 feet, and *if* it desired them to do so, the air traffic controllers of McMurdo would render assistance once they got to within forty miles of McMurdo. Not only is that meaning appar-

ent from the wording of the message itself, but it is also supported by a body of extrinsic evidence.

In the first place, the aircraft was very far from the only air traffic control radar at McMurdo, that at Ice Tower. The relevant mode of the Ice Tower Quad Radar for purposes of this case is the Airport Surveillance Radar (ASR),[32] with manufacturer's specifications of an absolute maximum range of 40 miles[33] and an actual operational range of 37 miles or less. At the time of the 12:20 p.m. radio exchange, Flight 901 was over 114 miles from McMurdo. Accordingly, no one could have assumed that radar contact would be immediate.

In fact, Mac Center advised the crew of the aircraft one minute later to attempt to contact Ice Tower on its own.[34] This contact was to be on a VHF frequency, the only direct means of radio communication between the aircraft and the air controllers monitoring the radar,[35] and the advice represented a clear indication that, at a minimum, a direct exchange between Flight 901 and Ice Tower was required for radar coverage to be furnished. Actually, no controller reported to Flight 901 that radar contact had been established—as would have been a routine necessity if, in fact, radar had been relied upon to guide the flight.[36] With the one brief exception at

28. During peak season, McMurdo has approximately 1,200 inhabitants and, as the largest human settlement on the continent, it is the foremost sightseeing attraction of the Antarctic overflights.

29. The McMurdo personnel have many duties. During the last hour of Flight 901, in addition to communicating with that flight, the air traffic controllers at McMurdo were also communicating with at least four other aircraft, outlying field camps and parties, and ground vehicles.

30. The passengers on Flight 901 were told that the flight would be taking advantage of the radar facilities at McMurdo so they could get "below the cloud and give us a view of the McMurdo area."

31. Captain Vette is also the author of the book "Impact Erebus," a reconstruction of the disaster.

32. The Ice Tower radar is called a Quad Radar because it is capable of operating in four modes.

For a further explanation regarding the ASR, *see* note 54, *infra.*

33. It is physically not possible to pick up an object on the instrument that is more than 40 miles away.

34. As indicated, the HF radio communications were with Mac Center. Ice Tower, with its traffic control radar, is several miles from Mac Center.

35. Mac Center also advised Ice Tower of Flight 901's distance and of the fact that the aircraft would attempt VHF contact.

36. Even plaintiffs' witness, Captain Vette, testified that a pilot would not assume that his craft was on radar unless told by a controller that this was the case.

12:35 p.m. noted below, no such contact was ever made.[37] To the contrary, as discussed below, the aircraft crew radioed several times that it would descend in what is called "visual meterological conditions" (VMC), meaning (1) that it could see where it was going, and (2) that it did not desire or need radar guidance.

The crew of Flight 901 itself understood that the HF exchange with Mac Center was not sufficient,[38] and that VHF contact with Ice Tower was a prerequisite to radar coverage. There are several reasons for this conclusion. The briefing papers the crew had received, their approach chart and terminal reports, the U.S. Department of Defense En Route Supplement they had aboard the aircraft, and the Department of Defense approach plate to McMurdo—all of them linked radar to VHF at Ice Tower. Moreover, it must have been the crew's experience—as it is the universal experience of aircraft crews—that ground radar is not available anywhere in the world on HF.[39] No doubt for these reasons, the crew not once asked for a radar letdown from Mac Center over the HF channel.[40]

When the crew advised Mac Center on HF that it had made two unsuccessful attempts to contact Ice Tower on VHF, Mac Center inquired whether the aircraft had at least achieved a lock on the McMurdo tactical aid to navigation (TACAN),[41] to which the crew responded in the negative. No such lock was achieved then or later.[42]

Unable to make radio contact with Ice Tower, Flight 901 spoke again with Mac Center at approximately 12:32. The crew advised at that time that the aircraft was some 43 miles away from McMurdo;[43] it wanted "further descent;" and it requested clearance to proceed in an orbit[44] in visual metereological conditions.[45] In response, Mac Center stated, "VMC descent is approved."

It is clearly established that, when the pilot told Mac Center that he wished to descend VMC, he effectively informed the controllers that he could see where he was going. In so doing, he took sole responsi-

---

**37.** For plaintiffs' contrary claim based on postcrash events, *see* Part V, *infra*.

**38.** In contrast to VHF, HF is a long range radio frequency and is not dependent upon an unobstructed line of sight between the transmitters.

**39.** As Captain Mannighan told the Court, no pilot talks on HF except during steady flight. In the terminal position of flight and in order to descend and to link to radar, the pilot will invariably use VHF, the radio frequency used by the radar controllers.

The reason for this is that HF is subject to distortion and interference to a much greater degree than VHF. As Mannighan said "the very reason for a terminal radar facility is to assist the pilot in bad weather, and that's when HF radio is at its worst." Conditions in Antarctica render HF even more unreliable.

**40.** The crew further knew that it was in a unique situation of a civilian aircraft crew communicating with a military air traffic control. Captain Mannighan testified, and common sense would dictate, that, because of this strange situation, the pilot had to be careful; he could not know how compatible or useful the controllers would be. Furthermore, the Flight 901 crew had been informed that the McMurdo navigational aids were not flight checked by the Federal Aviation Administration.

**41.** A TACAN is a stationary transmitter which sends out a signal received by an aircraft distance measuring equipment (DME). With a TACAN frequency, an aircraft is able to determine its distance from the TACAN, but not its position (azimuth) relative to the instrument.

**42.** The crew, which had forgotten to bring on board certain documents containing the civilian access code for the TACAN, requested it from Mac Center, which provided the military TACAN access code, not the civilian one. The crew did not inform Mac Center that it was unable to convert the military code into one that it was able to use and that this prevented it from achieving a lock on the TACAN.

**43.** When the crew told Mac Center of its distance from McMurdo Station it referred to DME, terminology associated with TACAN distance measurements. The air traffic controllers could have inferred from this remark that the crew had been successful in locking onto the TACAN.

**44.** Flight 901 flew in two orbits, or loops, prior to its final descent.

**45.** Plaintiffs would construe the 12:32 transmission as a request for controlled descent. That transmission is at best ambiguous, but even if plaintiffs' construction is correct—which the Court does not accept—it would not change the result for the reasons discussed below.

bility for separating the airplane from other aircraft and the terrain, and he was on his own.[46] There also was much credible testimony to the effect that, and the Court finds that, air traffic controllers are not in a position to challenge, or second guess, the representation of a pilot that he can see where he is going [47] and, indeed, that controllers are trained not to question such a representation.[48]

Meanwhile, the Ice Tower controller asked Mac Center to request the Flight 901 crew to recycle the aircraft transponder in order to improve radar reception, and it appears that the transponder was responding. However, the light on the transponder signalled only that Ice Tower was interrogating the aircraft, not that the aircraft appeared on the ground radar monitor.[49]

Another important communication occurred at 12:35 p.m. At that time Flight 901 and Ice Tower were in brief VHF radio communication, the only time that this occurred. During the few seconds of this contact, Flight 901 advised Ice Tower that it was descending through 13,000 feet, with the intention of descending to 10,000 feet. The controller acknowledged the message, and he stated in response that, as he understood it, Flight 901 would be "descending to 10,000 feet" in visual conditions and was "requesting a radar letdown through the cloud." According to the CVR on board of the aircraft, the crew confirmed the message by answering "affirmative." The tape recording simultaneously made at Ice Tower indicates, by contrast, that the controller did not receive an answer to his question.[50]

It is doubtful that, in view of the failure of the air traffic controllers to receive the crew's "affirmative" message, a meeting of the minds can be said to have occurred. Such a message would have been customary and expected if the crew agreed with the controllers' description of future plans, as well as with their belief that a radar letdown was being requested.

In any event, even if some agreement between the two sets of communicators is to be inferred from these messages notwithstanding the failure of the air traffic controllers to receive the crew's "affirmative" communication, the controllers could still not be faulted for not providing radar coverage. At best, the understanding would have been that Flight 901 would descend consecutively first in the visual mode and then by radar (the radar descent presumably being designed to enable the passengers to view the Station).[51] What was unclear at that juncture, however, and was to be left to further communications, was the time and the flight's location when the visual mode was to be succeeded by the radar mode.

No matter what the resolution, the flight crew could not have expected that the communications referred to above, without more, formed a basis for radar coverage at any stage.[52] There was a great deal of

**46.** This was testified to by many witnesses of vast experience, and it included both those who testified for plaintiffs and those testifying on behalf of defendant, such as Ray Priest, Robert Rudich, Ronald Wilson, Gordon Vette, Donald Lykens, Daniel Mannighan, and John Paulus.

**47.** Captain Mannighan, a pilot with long experience, including as captain of a United Airlines jet, testified that he had never in his career been challenged by a controller when he decided to proceed visually.

**48.** Ray Priest, Ronald Wilson, and Lewis Center all testified to that fact. Court decisions, too, recognize that the pilot of a aircraft is the final authority of the operation of his aircraft, and that he is regarded as being in the best position to judge outside conditions. *See generally Brock v. United States,* 596 F.2d 93 (4th Cir.1979);

*Black v. United States,* 441 F.2d 741 (5th Cir. 1971); *American Airlines v. United States,* 418 F.2d 180 (5th Cir.1969).

**49.** Radar signals from the ground are much stronger than signals sent by an airborne transmitter to the ground station.

**50.** The Ice Tower tape shows two of its own transmissions at the time in question, without any Flight 901 message in between.

**51.** *See* note 28, *supra.*

**52.** Soon after this brief VHF contact, both Ice Tower and Flight 901 informed Mac Center that VHF communications had been lost and that primary air-ground contact would be with Mac Center, in HF, while attempts were made to resume VHF contact with Ice Tower.

credible testimony, and the Court finds, that the crew of an aircraft is not justified in assuming that radar guidance will be available unless and until it is specifically advised by an air traffic controller that radar contact has actually been established.[53] Not only was such advice never explicitly given but the establishment of radar contact could not have been implicitly assumed by the crew: in the circumstances existing at McMurdo, the achievement of such contact was by no means an easy or open and shut matter, regardless of the wishes of the operator.[54]

■ Finally, even if it be assumed, *arguendo*, that the crew of Flight 901 did expect radar guidance notwithstanding all these contingencies and potential difficulties, this expectation could not justify its descent into unknown terrain without radar. If in the opinion of the crew VMC was not adequate and if, for whatever reason, radar guidance was not forthcoming, the only proper course of action was not to descend.[55]

It was entirely reasonable of the air traffic controllers to expect that that was the option Flight 901 would exercise. The air traffic controllers could not possibly assume that the crew, which was proceeding visually, did not have the high terrain in the area, specifically Mt. Erebus, in sight. Alternatively, the controllers could not be expected to assume that the crew would choose to descend below the known elevation of the terrain if it could not see where the flight was going.[56] According to the expert witnesses, a pilot should first fix his position, particularly if he is in uncontrolled airspace, and then, and only then, after he has determined that it is safe, make his descent.[57] This rule holds true whether or not radar assistance is anticipated. The evidence at trial also showed that, for Flight 901 to descend below 16,000 feet while lost would have been contrary to the most basic tenets of good airmanship and stated company policy.[58]

Ultimately it was the descent, without inquiry into terrain conditions that caused the crash. On the hypothesis of a justified expectation by the crew of the receipt of radar guidance—which the Court finds not to have been established by the evidence—the crew's own negligence was an intervening cause, vitiating any prior controller fault.

In the event, Flight 901 itself formally abandoned the plan of a letdown by radar. At 12:42, it advised Mac Center that it was still unable to make contact with Ice Tower on VHF, and it went on to inform the

---

**53.** On establishing radar contact, the air traffic controller would also normally give the crew a minimum vector altitude for instrument flight rules.

**54.** The ASR Quad Radar is a narrow beam radar, one-and-a-half degrees wide, which means that the controller must raise and lower the antenna again and again in order to capture a target. If the target is not caught in the beam as a result of these manipulations, it will not appear on the radar. In that respect it differs from the radar normally in use in the United States which on rotation picks up whatever object may be in its range. Further, since the Quad radar is a raw radar, it reflects off any object it hits, with the result that the screen contains considerable clutter, making it difficult to see any target, particularly in proximity to high terrain.

**55.** At that point, as well as for some time thereafter, the pilot could easily have returned to New Zealand, proceeded to another area in Antarctica, or climbed and proceeded to McMurdo at a safe altitude.

**56.** Peter Mulgrew, a former polar explorer, who had no experience in the northern region of Antarctica where the airplane was located or in examining Antarctica from the air, but who was hired by Air New Zealand to provide commentary for the passengers, said in an intra-cockpit conversation, at 12:46, apparently to the passengers, that he "can't see very much ..." but he would keep them informed as "soon as I see something that gives me a clue as to where we are." About this time, Brooks, the only crew member to have been to Antarctica before, asked, "where is Erebus in relationship to us at the moment?"

**57.** As Captain Mannighan said, "It's a breach of good airmanship to descend in hopes of fixing one's position. It is a reversal, in fact, of what a pilot ought to be doing. One fixes one's position first and then descends...."

**58.** *See* note 16, *supra.* Had the crew adhered to the 16,000 foot minimum altitude prescribed by Air New Zealand, Flight 901 would of course have safely flown over Mt. Erebus.

Center, once again, that the aircraft was travelling VMC, and that it intended to descend while flying north from McMurdo[59] and eventually to "proceed visually to McMurdo." Mac Center replied by reminding Flight 901 to remain in visual conditions, and to report to Mac Center when it was within ten miles of McMurdo. Flight 901 again stated that "we will maintain VMC." At 12:45, in what was the next to the last communication for Flight 901,[60] the crew stated that the aircraft was at 6,000 feet, descending to 2,000 and, once more, "we're VMC."

At 12:48, Captain Collins learned from First Officer Cassin that the airplane had not obtained the TACAN frequency. This appears to have been the first time that the pilot seemed concerned about the issue of contact with Ice Tower. Cassin accordingly tried again to make contact, but to no avail. Shortly thereafter, Gordon Brooks said from the cockpit "I don't like this."[61] Twelve seconds later, at approximately 12:50 p.m., Flight 901 crashed into the northern slope of 12,450 foot Mt. Erebus at an altitude of 1,500 feet.[62]

The Court finds as a fact that the communications between Flight 901 and the McMurdo stations were not such that they should have required or caused the controllers to furnish radar assistance. The Court further finds that, if the crew of Flight 901 believed that it could not proceed in the direction of McMurdo without radar assistance, it had an obligation to go elsewhere, and that the air traffic controllers cannot be faulted for failing to anticipate that the crew would proceed to McMurdo anyway, and that it would do so at an altitude that would inevitably lead to a crash into Mt. Erebus.

## V

### These Conclusions Are Not Altered By Post–Crash Evidence

The official message sent from McMurdo within hours of loss of communication with Flight 901 notifying various Navy commands of the aircraft's status as missing, states that the aircraft's last known position was "38 miles true north" of McMurdo. On the basis of these messages, and because Flight 901 itself never reported a position of 38 miles north, plaintiffs contend that, contrary to the conclusions reported in Part IV, *supra*, the aircraft must have been on the McMurdo radar a few minutes before the crash.

The source of the "38 mile" transmission was Tim Moore, one of the Ice Tower controllers. That individual was a witness at the trial, and he explained that he used the 38 mile figure as a mere estimate when he was asked by Ray Priest,[63] the supervising controller at Mac Center, of the position of the aircraft at the time Ice Tower had its single brief radio communication with Flight 901 at 12:35 p.m.[64] Standing alone, this explanation might be regarded as self-serving and hence suspicious. However, the explanation was corroborated by the credible testimony of Chief Petty Officer Wilson, who testified that he was never advised by any source that the flight was

---

**59.** The northern direction was presumably assumed during one of Flight 901's orbits or loops; alternatively, the northern direction could have been taken by the controllers to mean that the flight was returning to New Zealand. The crew never advised the controllers that it had changed from its outbound course.

**60.** The last communication was at 12:49, just prior to the crash, and it merely constituted an attempt to reestablish contact.

**61.** Another crew member stated that it was clear to turn right although there had to have been an absence of forward visibility.

**62.** In those last seconds the aircraft travelled straight and level at 1,500 feet, with a 5 degree nose up attitude at 260 knots. The aircraft was rotated in pitch to approximately 10 degrees nose up on impact.

**63.** The author of the official messages was Chief Warrant Officer Choyce Prewitt who consulted Warrant Officer Priest before drafting the messages.

**64.** Moore's recollection of the VHF contact was recorded on the transcript of communications between the Tower and Mac Center at 2:23 p.m. Moore stated: "[Flight 901] gave a position, ah Ray of Thirty I believe it was thirty eight miles and proceeding VFR is all he said."

38 miles north of McMurdo.[65]

Beyond that, the Court is persuaded by the evidence that Flight 901 did not ever come within the theoretical, much less the practical, coverage of the Ice Tower radar.[66] This evidence is somewhat complex, and it must therefore be related in some detail.

Plaintiffs' expert on radar, John Hocking, testified that, based on the flight track of Flight 901 pictured in the appendices to the Chippindale Report,[67] he reconstructed the aircraft's flight path, concluding that the aircraft was within radar range for approximately one minute, time enough for some 200 radar pulses to impact the aircraft, each of which should have produced a radar return on the Ice Tower's control scope. Hocking candidly acknowledged, however, that his were only paper calculations, based on the manufacturer's specifications for the radar, and that if the flight track differed from that reported in the Chippindale Report, his mathematical calculations were invalid. Relatively minor discrepancies could be of major significance inasmuch as Hocking's testimony places Flight 901 extremely close to the 37 mile reach of Ice Tower's Airport Surveillance Radar.

Serious doubt is cast on Hocking's opinion in several respects. First, Hocking conceded on cross-examination that a three-mile discrepancy exists between the actual location of the airplane and the location where it is placed by the data in the Chippindale Report; this difference, he also conceded, could take the airplane entirely out of radar range. Second, the witness equivocated in his testimony, contradicting himself both during the trial and in comparison with his testimony at deposition, as to, among other things, the amount of time the aircraft was within the range of the radar. The defendant's expert on this issue, Lewis Center, who flatly contradicted Hocking, was far more confidence-inspiring in this respect than Hocking. Third, Hocking had never seen radar of the type used at the Ice Tower until he gave his deposition; he had no experience in the operation of radar in the polar region and knew little of Antarctica generally.[68]

As it happens, Chippindale himself testified that the flight track depicted in his report was not mathematically precise, with the impact position of the airplane the only certain point, and that, for example, no account was taken of the prevailing wind conditions that day. The Court is convinced, as was Mr. Center, that reconstruction of the exact track for Flight 901 is impossible, if only because an accurate reconstruction would have required knowledge of the winds at every point along the track.[69]

Finally, while the precise path of Flight 901 cannot be known with certainty, the CVR and the Flight Data Recorder[70] provide information that is inconsistent with reliance on the Chippindale Report's flight

---

65. Other contemporaneous transmission by the Ice Tower convince the Court that the controller at Ice Tower did not know precisely where Flight 901 was. For example, Ice Tower told a Navy aircraft at 1:09 p.m. that it did not know where Flight 901 was, and it relayed a similar message to an Air Force airplane at 1:17 p.m.

66. The controller at Ice Tower testified that he was searching the screen for Flight 901 but did not see it. *See* note 54, *supra*. At 1:14 p.m. the controller had actually informed Mac Center that he had "looked earlier and was unable to [see Flight 901] and we never did get an IFF on him."

67. *See* note 82, *infra*.

68. The illustrative model Hockings used to demonstrate the radar coverage in the McMurdo area is also inaccurate in several important respects: (a) the radar is positioned 1,050 feet too far to the true west; (b) the pegs allegedly illustrating the aircraft's altitude are too long, adding approximately 1,765 feet and 2,200 feet in altitude at two critical points; and (c) the terrain features are incompletely displayed. It is the Court's assessment that the model used by Hockings makes radar coverage appear more likely than it was in reality.

The model is in evidence, as is also a more accurate model constructed for the defendant.

69. The winds distort any suggested track, altering the shape of turns and the length of the legs of the flight course.

70. That instrument records a substantial number of parameters which indicate aircraft performance, such as heading, altitude, speed, and rate of descent.

tracks as mathematically precise. For example, the crew of Flight 901 reported its distance from McMurdo at 12:32 p.m. as 43 miles when actually, as the Flight Data Recorder registered, it was at that time 46 miles away from McMurdo.[71]

For these reasons, the "38–mile" message does not alter the Court's conclusions regarding the effect of the radar contacts discussed in Part IV, *supra.*

## VI

### *The Air Traffic Controllers Did Not Know That Flight 901 Was In Danger*

■ Plaintiffs argue in a variety of ways that, even if there was no request for and grant of radar assistance, the air traffic controllers had an affirmative duty to take action to redirect the flight.[72] There is no merit to these arguments.

Plaintiffs' contentions rest in substantial part on two interrelated propositions: (1) that the absence or the erratic performance of the VHF contacts should have alerted the controllers to the probability of danger, and (2) that the controllers were in a better position than the flight crew to determine the location of the aircraft in relation to the terrain.

### A. There Was No Reason To Anticipate A Dangerous Situation

First. Plaintiffs argue that the controllers should have been alerted to substantial dangers when Flight 901 did not appear on their screens, they should have assumed that the aircraft was near the mountains, and they should therefore have taken measure to save the DC–10. But the absence of a radar target for Flight 901 would not have seemed at all unusual to the controllers or as indicative of their proximity to mountainous terrain. For the fact is that the Air New Zealand flight did not present a radar target at any point, including at a time when it was at high altitude, far away from the Ross Island peaks.[73] This circumstance renders it entirely unlikely that a controller would associate a lack of radar contact with the aircraft's descent. *See* note 54, *supra.* The short of it is that neither the crew of Flight 901 nor the controllers ever considered the possibility that the absence of VHF contact was attributable to interfering terrain, including the mountain.[74]

Second. Inasmuch as erratic radio performance was a fact of Antarctic life and the equipment at the Ice Tower was known to malfunction with a fair amount of frequency,[75] the controllers were not surprised or alarmed by the failure to secure a line of communication. Moreover, as they well knew, such irregular VHF contact normally created no problem for pilots, because an aircraft could fix its position by other means, including the TACAN, the AINS, or its own weather radar aboard the airplane.

---

**71.** The explanation for this variance is that the Inertial Navigation System, from which the pilot drew his distance data, was in error by about 3 miles.

The Flight Data Recorder also indicates that the aircraft began its turn 13 seconds after the position report of 43 miles, when the aircraft would have traveled about 1.2 miles. The turn therefore began at about 41.8 miles from McMurdo, meaning that at no time during the resulting orbit to the true west of McMurdo would Flight 901 have been within the 40 mile theoretical coverage of the McMurdo radar, let alone the 37 mile practical coverage.

**72.** *See generally* plaintiffs' proposed Conclusions of Law 15 through 27.

**73.** The radar controller had received no IFF signal for Flight 901 when the aircraft was at altitudes, including a height of 32,000 feet, considerably higher than Mt. Erebus.

**74.** Air traffic controller Ronald Wilson, for example, never stated or intimated that he might be unable to contact Flight 901 because it was hidden behind an obstruction. For the reasons stated, his lack of concern was reasonable. Plaintiffs' witness, Robert Rudick, also said as much, giving it as his opinion that at 18,000 feet, and at a distance of 43 miles from McMurdo, there would have been line-of-sight higher than Mt. Erebus between the airplane and Ice Tower's radar antenna.

**75.** Defendants' witness John Paulus testified that pilots picked up VHF sometimes 80 miles away from McMurdo Station, at other times not until they were 20 miles away.

Third. At no time was there alarm in the voices of those speaking from the cockpit of Flight 901 to the air traffic controllers.[76] Nor was there anything else in the dealings of one group of communicators with the other that should have reasonably alerted the controllers that Flight 901 was in peril.

Fourth. The aircraft, the plaintiffs' agree, was operating VMC; the crew repeatedly advised the controllers of that fact; and the air traffic controllers therefore naturally concluded that the crew could see where it was going. There was nothing in the experience or the training of the controllers to lead them to believe, or to speculate, that an airline crew, operating in a visual mode, would be unable to see a 12,450 foot volcano directly in front of it.

Fifth. This conclusion is not undermined but is strengthened by the theory advanced by plaintiffs' expert Gordon Vette, who regards the phenomenon of "sector whiteout" as an explanation for the crash of Flight 901.

Whiteout is an ocular illusion, occurring even when visibility is extremely good, that eliminates the horizon line from view and prevents the viewer from seeing obstacles in front of him.[77] Prior to Flight 901, the *only* documented cases of whiteout had occurred (1) to an to aircraft crew in the process of landing, (2) to ground vehicle operators, and (3) to pedestrians. Since Captain Vette was apparently the first person to have presented to experts in perceptual psychology and to the world at large

the theory of sector whiteout with respect to an aircraft in level flight,[78] the phenomenon was entirely unknown prior to the crash of Flight 901 and therefore by definition unfamiliar to the controllers at McMurdo on November 28, 1979. The air traffic controllers cannot be faulted for failing to predict that the flight crew would be unable to see the mountain on account of that phenomenon, particularly when neither its existence nor the possibility of its presence were ever mentioned to them.

## B. The Flight Crew Was In A Better Position To Appreciate the Danger Than The Controllers

It is quite true that, as plaintiffs argue, under certain circumstances an air traffic controller must take extraordinary steps to ensure the safety of an aircraft even when the danger may also be apparent to the pilot. However, the principal cases cited by plaintiffs for that unexceptional proposition are not only wholly different on their facts from the instant case, but the qualifications found in the decisions serve to accentuate that difference. *Hartz v. United States,* 387 F.2d 870 (5th Cir.1968), *Gill v. United States,* 429 F.2d 1072 (5th Cir.1970), *Rudelson v. United States,* 602 F.2d 1326 (9th Cir.1979), and *Stork v. United States,* 430 F.2d 1104 (9th Cir.1970), involved either small private aircraft in situations where pilots with limited experience could have had only sketchy information or controller violations of regulations.[79]

---

**76.** Officer Gordon Brooks' comments just before the crash (*see* text to note 61, *supra* ) were made to the cockpit crew and did not reach the ears of the air traffic controllers.

**77.** Sector whiteout, as Vette describes it, is a modified whiteout in which the viewer can distinguish the horizon line but still cannot see the obstruction in front of him.

**78.** Defendants' witness Robert Thompson corroborated sector whiteout and the Vette explanation for the lack of anxiety by the crew regarding the presence of Mt. Erebus while flying VMC. One year after the accident, Thompson experienced sector whiteout in Lewis Bay, near the northern slope of Mt. Erebus, while in a helicopter reenacting the flight of 901. As he describes it, the elimination of Mt. Erebus from view was made possible by the ice on the water below, the clouds above and the fog that drifts

into Lewis Bay between 11:00 a.m. and 1:00 p.m. during the austral summer. Although he thought he could see clearly ahead, he was not able to see the mountain.

**79.** In *Hartz,* a small Beechcraft Bonanza was destroyed by turbulence from a commercial DC–7 which had been cleared by a controller for take-off only seconds before take-off clearance was given to the Beechcraft. In *Gill,* a "light, private airplane" with limited instrumentation, crashed when an FAA employee gave to the pilot "in-flight weather information which was inexact, incomplete and in all reasonable probability misleading." 429 F.2d at 1075. In *Rudelson,* a Cessna piloted by a student aviator collided with a Piper aircraft while in the airfield's entry corridor, the court holding that the teaching exercises, among other factors, would distract the student and the instructor sufficient-

All the decisions, those cited by plaintiffs and others dealing with the same subject matter, emphasize that (1) the pilot has primary responsibility for the movement of his aircraft, and (2) only if the controller is better qualified by training, experience, and vantage point than the pilot to estimate time and distance will he be held liable. As applied to Flight 901, these cases and these principles are of no help to plaintiffs, for the errors that were made were entirely the crew's.

The DC–10 was a state of the art aircraft under the control of a fully qualified crew at the helm of which was a pilot with a wealth of flying experience. At least until the very end, Flight 901 was proceeding in visual conditions, that is, the crew could see the topography around it that the controllers obviously could not see. For example, as noted above, had the crew paid attention to the seascape, it would have recognized Beaufort Island (which was readily discernable on photographs taken by passengers) and realized that it was located on the right side of the aircraft rather than the left, as it should have been if the aircraft were overflying the Sound.[80]

Other aids on board Flight 901—obviously unavailable to the air traffic controllers—would have quickly told the crew where they were. The aircraft's internal navigation system has a "present position" function, the name of which indicates its purpose—to inform the crew of the location of the airplane. It offers a digital readout of the airplane's geographical position by coordinates. All the crew had to do was place those coordinates on a map. Had a single crew member performed this simple task at any time during the last hour of flight, he would have learned that the air-craft was not on longitude 165 degrees heading down the open sound, but on a longitude of 167 degrees heading toward Mt. Erebus.

In addition to the "present position" function and the eyes of the crew, there was on board a Bendix RDR–1F weather radar which can map terrain, and which is not affected by ice or snow. If the crew of Flight 901 had used that radar, in either its weather or its terrain mode, during the flight's approach to McMurdo Sound, it would have seen a land mass directly in front which should not have been there if the flight were proceeding down McMurdo Sound. The nearing land mass would obviously have warned the crew to correct the flight path to avoid collision.

In short, not only were the controllers not in a superior position to determine the aircraft's course, as the cases assigning responsibility to ground personnel require, but the aircraft crew had the advantage over the controllers in every respect.

Most obviously, had the crew kept the airplane above the height of Mt. Erebus, the accident would not have happened. The decision to descend was solely the crew's; the controllers had no influence over it.

Plaintiffs would shift that responsibility. The essence of the erroneous assumptions underlying that attempted shift is captured most simply yet fully in one of their proposed findings of fact (No. 118): "A reasonably prudent flight crew would have taken appropriate action if queried during the last 2 minutes of flight to verify the aircraft's relative position to Ross Island." At that juncture Flight 901 was in the visual mode and, as far as the controllers

---

ly to require the controllers to monitor the flight while it was in the vicinity of the corridor. And *Stork* involved the attempted take-off by a nonscheduled carrier plane in weather that was below minimum under FAA regulations. Nevertheless, at his request, the pilot was cleared, and the plane crashed. The court stated that, while normally the pilot makes decisions of the kind there necessary, when flight is flatly forbidden by regulations on account of weather conditions, a controller may not clear the plane.

**80.** It may be that the crew was confused between the entrance to Lewis Bay and that to McMurdo Sound, but such a misreading would likewise have been unreasonable. While the judging of distances in Antarctica can be deceiving, this does not explain why the crew would not have been concerned that they could not see the mountains around the Dry Valleys where they knew the weather to be clear; nor does it explain why the crew did not perceive the difference in the angles at which they were seeing the cliffs around the bays.

knew, Mt. Bird and Mt. Erebus loomed so large as to be practically present in the cockpit. It is in these circumstances that plaintiffs would place responsibility on the controllers, who did not know the location of Flight 901, for querying the crew[81] or warning it of the presence of Ross Island with its mountains. That inversion of responsibility is entirely unreasonable.

## VII

### Conclusion

Upon consideration of all the evidence,[82] the Court finds as a fact that the disaster at Mt. Erebus on November 28, 1979, was caused by a combination of (1) the careless attitude of the New Zealand airline in switching flight plans for Flight 901 as and when it did, without a thorough briefing of the flight crew regarding the switch and its implications, and (2) the careless performance of the crew which did not avail itself of several available fail-safe systems, any one of which would have enabled it to discover in ample time that it was not on a proper course and would have permitted it to alter that course without significant difficulty. The air traffic controllers at McMurdo Station had no reason to suspect that these errors in the most fundamental principles of planning and airmanship had occurred, and that they had profoundly altered what would otherwise have been a safe and uneventful flight. Absent such knowledge, they had no basis for suspecting that Flight 901 was in mortal peril, or for taking extraordinary measures that even the flight crew never requested them to take.

For these reasons, the Court concludes that the disaster that befell Flight 901 on November 28, 1979 in Antarctica was the fault of Air New Zealand and of the flight crew, and that the Navy air traffic controllers at McMurdo Station bear no responsibility for the event. Accordingly, judgment will be entered in favor of the defendant, the United States.

**81.** It is not clear what that query would have been. For the controllers to have asked an aircraft crew descending VMC whether it could really see where it was going would have been nonsensical.

**82.** The Court also considered the following.

First. The Court admitted into evidence the so-called Chippindale Report, and it heard testimony from R. Chippindale, Chief Inspector, Air Accidents of the New Zealand Ministry of Transport. The Inspector had conducted an official investigation of the circumstances of the accident of Flight 901, and he issued a report on May 31, 1980. Although the Court does not rely on the ultimate Chippindale conclusions, it is interesting to note that the Inspector found the probable cause of the accident to be "the decision of the captain to continue the flight at low level toward an area of poor surface and horizon definition when the crew was not certain of their position and the subsequent inability to detect the rising terrain which intercepted the aircraft's flight path." Inspector Chippindale testified at the trial that he did not regard the United States Navy as a contributing factor to the disaster, and he completely absolved the Navy of all fault.

Second. A separate investigation was conducted by a Royal Commission, chaired by Judge P.T. Mahon, of the High Court at Auckland, which heard evidence over a period of 75 days and issued its report on April 16, 1981.

During trial, the Court ruled this report inadmissible because, among other things, it is permeated with Judge Mahon's opinions, but it nevertheless permitted plaintiffs to extract portions of the report and proffer them as worthy of trust pursuant to Fed.R.Evid. 803(8). Upon review of the profferred portions, the Court concludes that many of them are irrelevant or duplicative of admitted evidence and are excludable as such. The remainder is untrustworthy for a variety of reasons. For example, some parts are directly contrary to facts that were undisputed at the trial here or to facts clearly established by the evidence at that trial. Other portions rely largely on hearsay and speculation and on the judge's *ex parte* interviews with witnesses whom plaintiffs could have produced at the trial here. Significantly, defendant had no opportunity to challenge any of the sources underlying the findings in the report since its representatives were not asked to participate in the inquiry.

In reaching its decision to exclude the Royal Commission report, the Court thoroughly reviewed the profferred portions of the report and finds that, even if they were admitted, they would not change the end result.

# APPENDIX

NEW
ZEALAND
2,40. miles

Beaufort
Island

ROSS SEA

POSS SEA

ROSS
ISLAND

ICE SHELF

McMURDO
SOUND

Mt.Erebus

McMurdo
Station

ICE SHELF

POLAR
PLATEAU

ICE
SHELF

ANTARCTICA
ROSS ISLAND AREA

30 miles